# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF INDIANA
## HAMMOND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) 01 CR 73 |
| | ) |
| STYLES TAYLOR and | ) Honorable Charles R. Norgle |
| KEON THOMAS, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION ON REMAND

CHARLES R. NORGLE, District Judge

This case is before the District Court on remand from the Seventh Circuit Court of
Appeals. On May 13, 2008, the Seventh Circuit instructed this Court to conduct an evidentiary
hearing and to determine de novo whether Defendants' Batson challenge is meritorious. The
Court conducted an evidentiary hearing on November 3, 2008, and, for the following reasons,
determines that Defendants' Batson challenge fails.

## I. BACKGROUND

### A. INDICTMENT AND TRIAL

On April 12, 2000, Hammond, Indiana police officers arrested Styles Taylor ("Taylor")
based on information obtained from two confidential sources regarding the murder of Hammond
businessman Frank Freund ("Freund"). United States v. Taylor, 302 F. Supp. 2d 909, 911 (N.D.
Ind. 2004). Freund had owned and operated the Firearms Unlimited Gun Shop in Hammond for
several years. United States v. Taylor, 293 F. Supp. 2d 884, 889 (N.D. Ind. 2003). One of the
confidential informants indicated that Taylor shot and killed Freund, who was working behind

1

the counter at the Gun Shop, while other individuals robbed the Shop. Taylor, 302 F. Supp. 2d at 914. Freund, an elderly Caucasian individual, was shot twice at close range with a pistol while alone in his Shop. One of the gunshots struck Freund in the face. Certain family members arrived at the scene when later informed of the tragic events by the police and fire departments.

À grand jury returned a seven count indictment against Taylor, Keon Thomas ("Keon"), Damione Thomas ("Damione") and Adam Williams, Jr. ("Williams") in April 2001. United States v. Taylor, 509 F.3d 839, 842 (7th Cir. 2007). The indictment charged Taylor and Keon with conspiracy to commit robbery and murder, 18 U.S.C. § 1951, robbery in violation of the Hobbes Act, id., and committing murder during the robbery, 18 U.S.C. § 924(c) and (j). Id. Damione was charged with conspiracy, robbery and murder, while Williams was charged with being an accessory after the fact and perjury before the Grand Jury. Taylor, 293 F. Supp. at 889. Damione and Williams pled guilty to certain charges and agreed to cooperate with the government. Id. Taylor and Keon ("Defendants"), both African-American, elected to plead not guilty and to exercise their right to trial by jury. Taylor, 509 F.3d at 842.

Jury selection began on July 6, 2004, in the Northern District of Indiana's Hammond Division, before Judge Sharp. Id. Prior to that date, the jury pool had filled out questionnaires that included questions inquiring into the potential jurors' stance on the death penalty. Id. These questions asked the potential jurors to, inter alia, circle letters corresponding to statements articulating various viewpoints regarding the death penalty. For example, the letter "a" corresponded to the statement "I am personally, morally, or religiously opposed to the death penalty, and will never vote to impose it under any circumstances." Juror Questionnaire at 23. The letter "e" corresponded to the statement "[i]n a case in which the defendant is convicted and

2

in which the death penalty is requested, I can vote to impose the death penalty or a sentence other than death, whichever is appropriate based on the facts and the law in the case." Id. The letter "I" corresponded to the statement "[i]n a case in which the defendant is convicted and in which the death penalty is requested, I will always vote to impose the death penalty." Id. Circling any of the letters "a" through "d" indicted a general opposition to the death penalty, while circling any of the letters "f" through "I" indicated a general approval of the death penalty.

The government sought to impose the death penalty on both Defendants, despite the fact that forensic evidence showed that only one Defendant had fired the shots that killed Freund. Id. The government therefore asked Judge Sharp to inquire of potential jurors whether they could impose the death penalty on a non-shooter. Id. Judge Sharp declined the government's invitation to make this inquiry, reasoning that it would not be appropriate at that time to "wade into who is the triggerman and who is not a triggerman." Id. During the first day of jury selection, three jurors were seated, but on the following day, Judge Sharp recused himself because of illness. Id. Judge Norgle was then assigned to the case.

On July 29, 2004, jury selection resumed before Judge Norgle. Id. The government again sought to question potential jurors regarding whether they could impose the death penalty on a non-shooter and Judge Norgle allowed the government to proceed. Id. The government asked this question of most potential jurors. Id.

During the jury selection process the Court interviewed 94 potential jurors. Id. at 843. Of these 94 potential jurors, 16 were African-American. Id. Three of these potential African-American jurors were dismissed because of family or health concerns, seven were dismissed for

3

cause and five were dismissed pursuant to the government's peremptory challenges. Id. One
African-American remained on the jury and three were selected as alternate jurors. Id.

During the voir dire, the government exercised a peremptory challenge against an
African-American juror, Heshla Watson ("Watson"), after she indicated that she could not
impose the death penalty on a non-shooter. Id. The defense did not immediately raise a Batson
challenge, but did after a third African-American juror was dismissed on the government's
peremptory challenge. Id. The defense then raised a Batson challenge every time the
government exercised peremptory challenges against other African-American potential jurors.
Id. The Court, each time the defense raised a Batson issue, found that a prima facie case of
discrimination had been established and asked the government to supply a race-neutral reason for
the challenge. Id. In each instance, after the government supplied its race-neutral reasons, the
Court concluded that these reasons were not pretext for racially motivated challenges. Id.
However, the Court inadvertently neglected to offer an explanation for upholding the
government's strike of potential juror Watson. Id. at 845.

Following a five-week trial, the jury found Defendants guilty on all counts. Id. at 843.
The sentencing phase of the trial then proceeded as to Taylor and the jury recommended a
sentence of life imprisonment. Id. The government then withdrew its notice of intent to seek the
death penalty for Keon. Id. The Court sentenced the Defendants to life imprisonment. Id.

## B. THE SEVENTH CIRCUIT'S FIRST OPINION AND LIMITED REMAND

On appeal, the Defendants asserted that the government used peremptory challenges to
strike African-Americans from the jury pool in violation of the Supreme Court's ruling in Batson

4

v. Kentucky, 476 U.S. 79 (1986).[1] The Seventh Circuit determined that a genuine Batson issue

existed regarding the government's strike of African-American potential juror Watson and the

government's lack of objection to Caucasian jurors Lillian Nowak ("Nowak"), Kimberly Wills

("Wills"), and Robert Evans ("Evans").

> When called upon to provide a race-neutral explanation for excluding Watson (whom
> the government had unsuccessfully challenged for cause), the government cited her
> statement that she would not consider imposing the death penalty on a non-shooter
> . . . . The defendants point to three Caucasian jurors who expressed similar
> reservations about executing a non-shooter but were not challenged by the
> government. We find their argument persuasive, particularly the comparison
> between Watson and Nowak. Both unequivocally answered "no" when first asked
> if they could impose the death penalty on a non-shooter. The government, in contrast
> to its practice with most other potential jurors, did not follow up with either of these
> potential jurors for a more detailed explanation of the "no" answer. The defense,
> however, elicited responses from both Watson and Nowak revealing a willingness
> to consider the non-shooter's level of participation and follow the law. We can
> discern no material difference between Watson and Nowak with respect to their
> views on the non-shooter issue – the *sole* reason the government supplied for its use
> of a peremptory strike against Watson . . . . Because the answer that was
> disqualifying for Watson was not also disqualifying for Nowak, we are inclined to
> view with skepticism the government's rationale for exercising a peremptory
> challenge against Watson. Comparing Watson to Wills and Evans compounds that
> skepticism. Wills in particular expressed views akin to Watson's: general but not
> forceful opposition to the death penalty (expressed on the questionnaire and during
> voir dire) and initial resistance to the idea of executing a non-shooter later tempered
> in response to follow-up questions. Yet the government challenged only Watson.

Taylor, 509 F.3d at 844-45.

The Court of Appeals rejected Defendants' Batson challenges regarding other African-

American potential jurors, but as to Watson, found it significant that the "district court did not

make a record of its credibility determination at the third stage of the Batson inquiry." Id. at 850-

51. The Seventh Circuit therefore ordered "a LIMITED REMAND so that the district court has

---

[1] Taylor also asserted that his Confrontation Clause rights were violated. Taylor, 509
F.3d at 841. The Seventh Circuit rejected this argument. Id.

5

the opportunity to supplement the record with its reasons for denying the Batson challenge with

respect to Heshla Watson." Id. The judgment of the District Court was affirmed in all other

respects. Id.

## C. THE DISTRICT COURT'S ORDER ON LIMITED REMAND

On January 17, 2008, the Court issued an Order finding that the government's stated

reason for exercising a peremptory challenge against Watson was credible. The Court found that

the government's challenge was honestly made, race-neutral and that nothing in the prosecutor's

demeanor indicated purposeful discrimination. The entirety of the Court's January 17, 2008

Order states:

> The Seventh Circuit Court of Appeals has ordered a limited remand of this case to
> the District Court because the District Court did not put factual findings on the record
> regarding the credibility of the government's reason for striking potential juror
> Heshla Watson. "For that reason we will remand to the district court for
> supplemental fact finding on this point." United States v. Taylor, – F.3d –, Nos. 05-
> 2007 & 05-2008, slip op. at 2 (7th Cir. Dec. 7, 2007). The Court of Appeals went on
> to say, "Therefore, we will retain jurisdiction over this case but remand to the district
> court for the limited purpose of supplementing the record with its findings about
> whether the government's stated reason for exercising a peremptory challenge against
> Watson is credible, or whether the defendants met their burden of demonstrating
> discrimination." Id. at 10.
>                   The court finds:
>           After the court denied the government's challenge for cause as to potential
> juror Watson, the court inquired whether there was a peremptory challenge.
> Assistant United States Attorney Philip Benson said: "We strike her peremptorily."
> The court replied: "Peremptory challenge by the government. It is so ordered."
>           All four attorneys of record were present and before the court. Physically the
> attorneys were a few feet away from the judge. It was clear to the court that the basis
> for the peremptory challenge was exactly the same as that articulated by the
> government as to cause. The court had just heard all of the answers given by Watson
> to the court's questions as well as the answers to the questions of counsel. The court
> entertained the arguments of defense counsel. The court finds the government's
> reason for the strike was credible. That reason stated by AUSA Benson was: "I asked
> her specifically the question, given your views on the death penalty, and the religious
> views she expressed in her questionnaire, would she even consider imposing the

6

death sentence on someone who is a non-shooter. Her answer was categorically, no.
Under the case law I gave the court previously, that's . . . that's grounds for cause.
We respect her views, but we disagree with them."

The court finds that the government's challenge to potential juror Watson was
honestly made and was race neutral. The strike was not racially motivated. It was
not pretextual. As the court heard and observed AUSA Benson making the strike,
the court concluded his motive was genuine. Benson's demeanor was professional
and candid. Nothing he said or did indicated to the court that he was not telling the
truth as to the basis of the challenge. Nothing in his demeanor indicated purposeful
discrimination. The arguments of defense counsel also focused on the answers of
Watson and the non-shooter issue.

The court has assessed the credibility of the prosecutor's explanation for the
strike and finds that it was honestly made. The defendants have not carried their
burden of proving purposeful discrimination.

The explanation was race neutral and related to the particular case being tried.
Post indictment and well before voir dire, the government's view of the case as
reflected in the record before Judge Sharp and Judge Norgle was as follows. Two
individuals entered a Hammond, Indiana gun shop. The licensed owner was sitting
behind the counter. He was eating a Subway sandwich. Two shots were fired at
close range and struck the owner. One shot hit him in the face. The two individuals
took guns and fled.

Minute Order of January 17, 2008.

## D. THE SEVENTH CIRCUIT'S SECOND REMAND

On May 13, 2008, the Seventh Circuit vacated this Court's January 17, 2008 Order and

remanded for an evidentiary hearing. United States v. Taylor, 277 Fed. Appx. 610 (7th Cir. May

13, 2008). The Seventh Circuit was concerned that, as the race-neutral reason for challenging

Watson, the government indicated that she answered "no" when asked if she could impose the

death penalty on a non-shooter, while several Caucasian jurors answered the same question "no,"

and were not peremptorily challenged. Id. at 611. The Seventh Circuit explained that "the

unexplained discrepancy in treatment made a strong case that the government removed Watson

for discriminatory reasons." Id. The Seventh Circuit further emphasized that this Court's

January 17, 2008 Order provided no credibility determination as to the government's motives in

7

dismissing Watson based on her answer to the non-shooter question, when the government did not dismiss Caucasian jurors who gave the same answer to the non-shooter question. Id. at 612.

The Seventh Circuit therefore directed this Court to hold an evidentiary hearing to determine whether the government's explanation regarding its removal of Watson was credible. Id. at 612-13. The Appellate Court believes there is a gap in the record as to this issue and specifically instructed this Court to "question the prosecutor as to why the government eliminated Watson based on the non-shooter question but chose not to challenge similarly situated white jurors." Id. at 613. The Seventh Circuit also ordered that following the evidentiary hearing, "[t]he [district] court must then make the credibility determination based on all the relevant evidence, properly developed." Id. In conclusion, the Seventh Circuit stated, "the decision of the district court is VACATED and the case REMANDED for the court to conduct an evidentiary hearing and to determine de novo whether the Batson challenge has merit." Id.

## II. DISCUSSION

### A. STANDARD OF DECISION

It is a violation of the United States Constitution to use peremptory challenges to intentionally discriminate against jurors based on protected characteristics such as race, national origin and gender. J.E.B. v. Alabama ex rel. T.B., 511 U.S. 127, 146 (1994); Batson, 476 U.S. at 99; United States v. Vasquez-Lopez, 22 F.3d 900, 902 (9th Cir. 1994) ("[T]he Constitution forbids striking even a single prospective juror for a discriminatory purpose."). We recognize that "[t]he parties, the jurors, and society as a whole have a right to be free from intentional discrimination in the use of peremptory challenges." United States v. Stephens, 514 F.3d 703,

8

709 (7th Cir. 2008). The harm that results from the discriminatory use of peremptory challenges applies equally to all potential jurors and the community-at-large because it denies them the opportunity to participate fairly in the justice system. Id. at 709 (citing Powers v. Ohio, 499 U.S. 400, 406 (1991). With this in mind, courts acknowledge that while a defendant is not entitled to a jury comprised of persons of the defendant's own race, even in part, he or she certainly has "the right to be tried by a jury whose members are selected by nondiscriminatory criteria." Powers, 499 U.S. at 404; see generally Alverio v. Sam's Warehouse Club, Inc., 253 F.3d 933, 941 (7th Cir. 2001) ("First, the exclusion of all members of a specific minority group does not, on its own, establish that the peremptory strikes were discriminatory.")

To safeguard criminal defendants and the community against discriminatory peremptory challenges, the United States Supreme Court in Batson formulated a three-part test to determine whether the party invoking the peremptory challenge selected that course of action because of, not merely in spite of, its adverse effects upon an identifiable group. See Hernandez v. New York, 500 U.S. 352, 360 (1991) ("discriminatory intent or purpose is required to show a violation"); see also Washington v. Davis, 426 U.S. 229, 243 (1976) ("[I]n proper circumstances, the racial impact of a law, rather than its discriminatory purpose, is the critical factor"); Aki-Khuam v. Davis, 339 F.3d 521, 526 (7th Cir. 2003); Tinner v. United Ins. Co. of Am., 308 F.3d 697, 703 (7th Cir. 2002); United States v. Jordan, 223 F.3d 676, 686 (7th Cir. 2000). Under the Batson analysis, the party challenging the peremptory strike must first make a prima facie showing that the challenge was exercised pursuant to the potential juror's race, national origin or gender. Miller-El v. Cockrell, 537 U.S. 322, 328-29 (2003) ("Miller-El I"); United States v. Jones, 224 F.3d 621, 624 (7th Cir. 2000). Once that showing is made, the challenged party must

9

offer a race-neutral basis for striking the potential juror. Id.; see Jordan, 223 F.3d at 686. This explanation need not be particularly persuasive, but it cannot be a lie that is intended to hide a race-based motive on the part of the challenged party. United States v. White, 416 F.3d 634, 640 (7th Cir. 2005); United States v. George, 363 F.3d 666, 674 (7th Cir. 2004) ("[T]he government's proffered reason for the strike need not be particularly persuasive, or even based on quantifiable data, so long as it is not pretextual."). Of course, the weaker the reason, the more likely it is that the proffered explanation is pretext. See United States v. Roberts, 163 F.3d 998, 999 (7th Cir. 1998). As to Batson's third step, the trial court must determine using the parties' submissions whether the challenged party's explanation was pretextual and whether the defendant has shown purposeful discrimination. Id.; see Jordan, 223 F.3d at 686; Lamon v. Boatwright, 467 F.3d 1097, 1101 (7th Cir. 2006) ("The relevant question during the third step of the Batson inquiry is whether a strike was racially motivated.") (citing Williams v. Chrans, 957 F.2d 487, 491 (7th Cir. 1992)). "'[T]he ultimate burden of persuasion . . . rests with, and never shifts from, the opponent of the strike.'" Rice v. Collins, 546 U.S. 333, 338 (2006) (quoting Purkett v. Elem, 514 U.S. 765, 768 (1995)); Coulter v. McMann, 484 F.3d 459, 464 (7th Cir. 2007) ("The burden is on the defendant to show that her rights have been violated."); George, 363 F.3d at 673. In this case, the burden falls on the Defendants.

As stated above, this Opinion revisits the Court's previous ruling on the government's Batson challenge, but is limited to a credibility determination as to why the prosecutor, Philip Benson ("Benson"), excused an African-American juror, Watson, based on her answer to the non-shooter question in the juror questionnaire, but did not otherwise challenge three similar Caucasian jurors for the same response. Taylor, 277 Fed. Appx. at 612. On remand, the Court

10

conducted an evidentiary hearing that established a record as to the government's Batson

challenge. At this point, the Court's credibility determination resolves whether Benson's

explanation is plausible in light of all properly developed, relevant evidence before the Court.

Snyder v. Louisiana, 128 S. Ct. 1203, 1208 (2008) ("[I]n considering a Batson objection, or in

reviewing a ruling to be Batson error, all of the circumstances that bear upon the issue of racial

animosity must be consulted.") (citing Miller-El v. Dretke, 545 U.S. 231, 239 (2005) ("Miller-El

II")). And, in deciding this limited issue, the Court shall refrain from re-examining the first and

second Batson steps and will focus its inquiry on Batson's third step — a determination of

Benson's credibility.

"The question presented at the third stage of the Batson inquiry is 'whether the defendant

has shown purposeful discrimination.'" Snyder, 128 S. Ct. at 1212 (quoting Miller-El II, 545

U.S. at 277). The critical question in determining whether a defendant has proved purposeful

discrimination at Batson's last stage is the persuasiveness of the prosecution's justification for

the strike. United States v. Hendrix, 509 F.3d 362, 371 (7th Cir. 2007) (citing Miller-El I, 537

U.S. at 338-39); Hernandez, 500 U.S. at 365 ("In the typical peremptory challenge inquiry, the

decisive question will be whether counsel's race-neutral explanation for a peremptory challenge

should be believed."); Aki-Khuam, 339 F.3d at 527 (explaining Batson's third step). If the Court

finds that the prosecution offered a pretextual explanation, this naturally gives rise to an

inference of discriminatory intent. Purkett, 514 U.S. at 768 ("At [the third] stage, implausible or

fantastic justifications may (and probably will) be found to be pretexts for purposeful

discrimination.").

The issue, once again, is whether the trial court finds the prosecutor's race-neutral explanations to be credible. To measure the offering party's credibility, the Court looks to a number of factors. Coulter v. Gilmore, 155 F.3d 912, 921 (7th Cir. 1998) (stressing that Batson's third step requires an analysis of the totality of the circumstances). "'Credibility can be measured by, among other factors, the [offering party's] demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.'" Stephens, 514 F.3d at 711 (quoting Miller-El I, 537 U.S. at 339). The United States Supreme Court has explained, however, that observing the demeanor of the attorney will often provide the "best evidence" of purposeful discrimination. Hernandez, 500 U.S. at 365; Lamon, 467 F.3d at 1101.

A district court may also consider whether the offering party's explanation for the peremptory challenge corresponds to a valid challenge for cause. Stephens, 514 F.3d at 711. If it does, then it is plausible that the reason given by the prosecutor is race-neutral. Hernandez, 500 U.S. at 362-63 ("While the reason offered . . . for a peremptory challenge need not rise to a valid challenge for cause, the fact that it corresponds to a valid for-cause challenge will demonstrate its race-neutral character."). This is not to say, however, that it is necessary that the government's reasons for using a peremptory challenge rise to the level justifying the use of a challenge for cause. United States v. Smith, 324 F.3d 922, 927 (7th Cir. 2003) (citing Batson, 476 U.S. at 97). But if they do, those explanations will certainly support a finding of plausibility as to the race-neutral explanation, and thus add to the challenged party's credibility.

A district court may also evaluate credibility by considering whether the proffered reason for striking a potential juror applies just as well to a similar juror of a different race or gender

12

who was allowed to serve on the jury, which "'is evidence tending to prove purposeful discrimination to be considered at Batson's third step.'" Coulter, 484 F.3d at 465 (quoting Miller-El II, 545 U.S. at 241). When a district court makes a side-by-side comparison of jurors that have been excluded and included, it must acknowledge that:

> Picking jurors is a complex and multifaceted process. Individual factors and or characteristics often do not provide the "silver bullet" that will mean acceptance or rejection of any potential juror. Rather it is a combination of factors that will determine whether a party believes a juror will be favorable to their side.

Pruitt v. McAdory, 337 F.3d 921, 930-31 (7th Cir. 2003). Indeed, "[t]he decision to challenge a juror will often rest on the interplay of various factors." Dunham v. Frank's Nursery and Crafts, Inc., 967 F.2d 1121, 1126 (7th Cir. 1992). Juror comparators do not have to be "exactly identical" because "potential jurors are not products of a set of cookie cutters." Miller-El II, 545 U.S. at 247 n.6.

In the end, the Court must be mindful that honesty, in light of reasonableness, is the focus of Batson's third step. See Purkett, 514 U.S. at 769 (admonishing the trial court for focusing on the "reasonableness of the asserted nonracial motive" and for failing to consider the genuineness of the motive). It is well-settled that "Batson and its progeny direct trial judges to assess the honesty - not the accuracy - of a proffered race-neutral explanation." Hendrix, 509 F.3d at 371 (citing Lamon, 467 F.3d at 1101); United States v. Montgomery, 210 F.3d 446, 453 (5th Cir. 2000) ("[T]he ultimate inquiry for the judge is not whether counsel's reason is suspect, or weak, or irrational, but whether counsel is telling the truth in his or her assertion that the challenge is not race-based."). But the trial court simply cannot ignore the reasonableness of the prosecutor's explanation. As stated previously, a ridiculous or unreasonable race-neutral explanation, in the

13

district court's determination, may ultimately lessen the prosecutor's credibility. See Purkett, 514 U.S. at 768; Miller-El I, 537 U.S. at 339.

## B. THE EVIDENTIARY HEARING

This Court conducted an evidentiary hearing on November 3, 2008, in accordance with the Seventh Circuit's directive to "make [a] credibility determination based on all of the relevant evidence, properly developed." Taylor, 277 Fed. Appx. at 613. At the evidentiary hearing, Benson detailed the following perceived differences between prospective juror Watson and jurors Nowak, Evans and Wills. Benson presented these differences to the Court to demonstrate the government's race-neutral rationale for using a peremptory challenge against Watson, an African-American, but not Nowak, Evans and Wills, who are all Caucasian.

### 1. *Watson and Nowak*

#### a. **Juror Questionnaire Responses**

With respect to the important comparison of Watson and Nowak, see Taylor, 277 Fed. Appx. at 611 (quoting Taylor, 509 F.3d at 844), Benson used Watson's and Nowak's responses to both the juror questionnaire and the Court's questions regarding the death penalty to support his claim that Nowak had a stronger preference for the death penalty than Watson. In Benson's comparison of Watson and Nowak, he first focused on question 133 of the juror questionnaire:

Regarding question 133 [of the juror questionnaire], Miss Watson . . . circled D or E, Miss Nowak went one step further, she actually circled F.[2] Obviously, a position that's even favorable to the government, even though it's diluted with the D and E responses. It is different from what – from what Miss Watson had circled. . . . It is a position that is more pro-favorable to the death penalty than E or D, which was [sic]

_____

[2]     Answer F to question number 133 states in its entirety, "I am generally in favor of the death penalty. Nonetheless, I believe I can vote to impose a sentence other than death if it is called for by the facts and the law in the case." Juror Questionnaire at 23.

14

the only answers circled by Miss Watson. . . . So while it is a minor difference, it is a difference that she is indicating some type of more favorable view of the death penalty than Miss Watson. Based upon that question alone, she is.

Evidentiary Hr'g Tr. at 33-34 (citing Watson Juror Questionnaire at 23; Evans Juror

Questionnaire at 23).

Benson also identified as relevant Nowak's response to question 134 which asked,

"Please describe your feelings about the death penalty in your own words. How strong are they

and how long have you had them?" Juror Questionnaire at 23. Nowak responded, "I feel an eye

for an eye." Nowak Juror Questionnaire at 23. According to Benson, Nowak's responses to

questions 133 and 134:

> [I]ndicate[] a stronger preference for the death penalty in general than Miss Watson. And I know it's hard to draw a conclusion off two questions, but we are limited to these five or six questions in the questionnaire, and the five minutes that we have or ten minutes to talk to someone and get a feel overall for whether or not they are more pro or against the death penalty or at least neutral on the subject.

Evidentiary Hr'g Tr. at 36.

Benson went on to address Watson's and Nowak's responses to question number 136.

Question number 136 states as follows, "Please read the following two statements carefully, take

time to reflect, and check if either statement applies to you." Juror Questionnaire at 24. The first

statement reads, "I feel that my support for the death penalty will make it difficult for me to

perform my duty fairly and impartially as a juror in the first stage, guilt or innocence, of the

trial." Id. The second statement reads, "I feel that my opposition to the death penalty will make

it difficult for me to perform my duty fairly and impartially as a juror in the first stage." Id.

Benson informed the Court that, "Miss Watson checked neither of those, which is a neutral

position." Evidentiary Hr'g Tr. at 37 (citing Watson Juror Questionnaire at 24). Benson also

pointed out that Nowak, "in response to question 136, she checks the line that says, 'I feel that my support for the death penalty will make it difficult for me to perform my duty fairly and impartially as a juror in the first stage. . . .'" Id. at 37 (quoting Nowak Juror Questionnaire at 24). Benson stated that Nowak's response:

> [I]ndicates to me, as the trial attorney who was sitting there, that she really feels strongly about the death penalty. And that it could affect what she's going to do in this trial. And that would be consistent with a strong feeling – or the strong use of a phrase eye for an eye and her circling F [in response to question 133]. So just from the question regarding the death penalty on the questionnaire, you have a juror who at least the government perceives as being fairly pro death penalty. And all three of those answers circling F, an eye for an eye, and the support for the death penalty, making it difficult to weigh the evidence in the first phase is [sic] different from Miss Watson.

Id. at 37-8.

### b. Responses to the Court's Death Penalty Questions

Benson also found telling Nowak's answers to the Court's death penalty questions. Id. at 39-43. Specifically, when asked about her opinion on the death penalty, Nowak said, "[w]ell, I think, I feel an eye for an eye, but I don't think this type of thing is enough for that. I guess, I'm thinking if it's a child or something much more serious." Trial Tr. Vol. 5 at 88.

For Benson, Nowak's answer:

> [I]ndicates that she feels it's an eye for an eye, but she's referencing something that she may think about the case or not, that still causes her some reservation, but clearly she's reiterating her strong support and belief in an eye for eye. And that, obviously, as the government prosecutor sitting here is encouraging for the government. I don't think defense would argue that you probably want people – if you were the government on the jury who feel that every person's life has the same value.

Evidentiary Hr'g Tr. at 39-40.

Benson went on to highlight Nowak's response to the question, "[i]f the defendant is found guilty of conduct that is a capital offense beyond a reasonable doubt, would you always find in favor of the death penalty?" Trial Tr. Vol. 5 at 89-90. According to Benson, "[Nowak] said, 'no, not always,' indicating that there are times that she would, which accrues to the government's benefit." Evidentiary Hr'g Tr. at 41 (quoting Trial Tr. Vol. 5 at 90).

With respect to the question whether or not Nowak's views on the death penalty would prevent her from even considering the death penalty for a non-shooter, Trial Tr. Vol. 5 at 98, Benson stated that:

> Unlike Miss Watson when asked this question, [Nowak] said she would impose the death penalty. Initially, when [Watson] was asked this question by the government, she said she would not consider it. [Watson] said it twice. Miss Nowak indicated some hesitation to that position. She said, 'I would not impose the death penalty on a non-shooter.' And then she said, 'I don't think so,' which indicates some reservation.'

Evidentiary Hr'g Tr. at 41 (quoting Trial Tr. Vol. 5 at 98).

Under Benson's assessment:

> Although, it's a minor difference [between Watson's and Nowak's responses], it is a difference. And I think all counsel would agree that when you're in this voir dire process, you're trying to sort out those people who are similar to the ones who favor your position slightly. That is what goes on in voir dire. And that is, obviously, these answers when taken as a whole, clearly show that Miss Nowak had a stronger position in support of the death penalty than Miss Watson.

Id. at 42.

According to Benson, the government also found meaningful Nowak's response to a question about when the death penalty would be appropriate for an individual who killed someone other than a child. Id. Nowak answered, "Well, the same goes for that. An adult, too. If they don't – sometimes it happens at random, and they don't even know the person, and they

17

just do it." Trial Tr. Vol. 5 at 94. For Benson, "[Nowak's answer] was the exact facts of this case. At least, the government took that to mean that she was in a position to favor the death penalty where it was just a random act of senseless violence." Evidentiary Hr'g Tr. at 43. Benson then stated that he believed Nowak had indicated having:

> [S]ome feelings towards the death penalty being more applicable for someone who is helpless or a victim who was vulnerable as opposed to other people who sort of stand on the same footing with the defendants. And, obviously, that was one of the statutory aggravating factors in this case. I believe, it was a statutory aggravating factor, if not it was a nonstatutory on that Mr. Freund was so hard of hearing, that he wouldn't have been able to have the opportunity to defend himself. And therefore, we believe that those answers, as I stated, significantly show a difference between the background of Miss Nowak and Miss Watson.

Id.

### c. Watson's Family History with the Gary Police Department

Finally, Benson informed the Court that the government considered Watson to be a less attractive juror candidate than Nowak because:

> Miss Watson indicated that she had a niece and a nephew who had worked for the Gary Police Department, but they had left only after one year of being with the police force. Considering it takes about ten weeks to be in the academy, it's ironic that one person would leave after only one year with the department. But she had two relatives who left, and she volunteered the information that her niece left because she was having difficulty with the police department.

Id. at 44-45 (citing Trial Tr. Vol. 3 at 104-05).

According to Benson:

> It may be a minor point, but, obviously, when you couple that with all the other answers that it has some impact, although minor, on the government's decision as to whether or not Miss Watson would be favorable to government testimony as well as rendering a sentence of death if she felt it was appropriate.

Id. at 45.

18

## 2. *Watson and Evans*

### a. **Juror Questionnaire Responses**

Similar to Benson's comparison of Watson and Nowak, Benson found it significant that

Watson and Evans responded differently to question 133 of the juror questionnaire. Id. at 25-26.

In contrast to Watson who "took a position of D or E, which is neutral or somewhat reluctant to

impose the death penalty," id. (citing Watson Juror Questionnaire at 23), Evans:

> [T]ook the position, F, he actually favored the death penalty. Obviously, the government would want anybody on their jury who takes that position. If the Court goes back over their chart – and I know defense counsel has – there were very few people who got called into the jury box who had put F on their questionnaire. And there were even fewer – maybe two at the most, I don't want to say because I'm not a hundred percent sure, of people circled F who got on the jury. And, obviously, Judge, the government wants someone who has [an] initial view of the death penalty that they favor versus someone who is neutral on it or is slightly against it. You know, obviously, the defendant would want someone who would have a D or E instead of an F. I don't think they would stand up and say, yes, we want those people on the jury who circled F. And so, therefore, Mr. Evans right out of the box is different in his background from Miss Watson.

Id. at 25-7 (citing Evans Juror Questionnaire at 23).

Benson also drew a distinction between Watson's and Evans' response to question 135:

"Question number 135, Miss Watson did check, 'I feel [that] it is important that we have the

death penalty as punishment.' However, Mr. Evans went one step further on question 135. He

said, 'I feel strongly that it is important that we have the death penalty as punishment.' And that

would be consistent with his circling of F on question 133." Id. at 27 (quoting Watson Juror

Questionnaire at 24; Evans Juror Questionnaire at 24).

In addition, Benson spoke to the difference in Watson's and Evans' answer to question

119 regarding changes in gun laws. Benson stated that, "[Evans] didn't indicate that he felt there

19

needed to be any changes in the gun laws. Once again, compare that to Miss Watson who was advocating a change in the law as to allow convicted felons to have firearms." Id. at 32 (citing Watson Juror Questionnaire at 20; Evans Juror Questionnaire at 20).

### b. Responses to the Court's Death Penalty Questions

Benson saw important differences between Watson's and Evans' responses to the Court's questions regarding the death penalty as well. Benson pointed out that "Miss Watson initially said that she really preferred 'nobody had to, [] as far as the death penalty goes, but I don't know.' Compare that to Mr. Evans' opinion about the death penalty, 'I believe, in the death penalty, if [it's] proven beyond a reasonable doubt that it was actually committed, and they were guilty, yes.' Obviously, a much stronger position than Miss Watson." Id. at 28-9 (quoting Trial Tr. Vol. 3 at 102, 183).

In addition, Benson stated to the Court that in response to the Court's question whether "'your views regarding the death penalty prevent you from recommending a sentence of life in prison without parole regardless of the evidence,' [Evans'] answer was 'no.'" Id. at 29 (quoting Trial Tr. Vol. 3 at 183). As Benson identified, however, "When Miss Watson was asked that question, she indicated that on her own that I would rather do life in prison. Expressing a preference for one or the other, where Mr. Evans indicated his neutrality and the ability that he wouldn't be swayed one way or the other. He would weigh the evidence. And so those answers are different." Id. at 30 (citing Trial Tr. Vol. 3 at 103, 183).

With respect to the Court's question whether when "'the defendant is found guilty of conduct that is a capital offense beyond a reasonable doubt, would you always find in favor of the

20

death penalty,'" Mr. Evans said, 'I don't think so.'" Id. at 30 (quoting Trial Tr. at 183-84).

Benson commented that:

> [Evans'] answer accrues to the government's benefit. It indicates, to me at least, that
> he would be leaning towards the death penalty, but he thinks that he would not always
> find it. And compare that to – to Miss Watson's answer to that question was simply
> no, which is a more neutral answer. This answer is not. I believe, it indicates that he
> believes that he would not always find in favor of death, but he's not sure he wouldn't.
> And that, obviously, accrues to the government's benefit. So we think that is a
> significant difference in response to the Court's questioning. . . .

Id. at 30.

### c. Responses to the Government's Death Penalty Questions

Benson also brought to the Court's attention Watson's and Evans' responses to the

government's question whether a juror's views on the death penalty prevented him or her from

even considering the death penalty for the non-shooter. Id. at 31. Benson stated that Evans "on

his own answered initially, '[N]o, I don't think so,' but he could follow the law similar to what

Mr. Wills [sic] said, he volunteered that. And that is slightly different from what Miss Watson

said that, 'I would not consider a death penalty for the non-shooter,' and she said it twice." Id.

(quoting Trial Tr. Vol. 3 at 106-07, 185-86).

Benson did acknowledge that "when Mr. Evans was asked questions about would you

consider weighing the factors involved – and would you consider the background of the

defendant, he answered, yes, to those." Id. at 31-2 (citing Trial Tr. Vol. 3 at 185). Benson went

on to state, however, that:

> The government has to take all the answers as a whole from the witness in making its
> determination. The government is not only trying to obtain people who will convict
> a shooter, but also to obtain people who are frankly pro the death penalty to get the
> person who is the – I'm sorry – who is the non-shooter, as well as the shooter. So
> there's, obviously, a balancing when you have two defendants, and, obviously, only

21

one of them could have pulled the trigger in this situation. And we believe, based upon the totality of those answers, that Mr. Evans is different from Miss Watson.

Id. at 32:

### 3. *Watson and Wills*

#### a. Responses to the Court's Death Penalty Questions

For Benson, the differences between Watson and Wills were most evident in their respective opinions on the death penalty. Benson stated that "when Miss Watson was asked: 'Do you have an opinion about the death penalty, and if you do, what is your opinion. . . .' Her response was: 'My opinion, I really would prefer nobody had to, you know, as far as the death penalty goes, but I don't know.' The government's impression of that is that she doesn't want to have to administer the death penalty." Id. at 14 (quoting Trial Tr. Vol. 3 at 102).

In contrast, Benson noted that Wills' response to the same question was as follows: "'My opinion is I [] know [i]t's the law of the country that it's a possible penalty. I'm not really in favor of killing anyone, but I am in favor of upholding the laws of the country.'" Id. at 14-15 (quoting Trial Tr. Vol. 3 at 62).

Benson then stated that he believes:

[T]here's . . . a significant difference between those two responses. One indicates a preference towards not doing it. Another one indicates a preference that I may not be inclined to do it, but I will follow the law. And that's affirmatively stated on her own without any leading question from the Court, defense counsel or the government. And I think that all the parties would agree that if you had someone who had a reluctance to do anything, but on their own in conjunction with that reluctance expressed the desire to follow the law in detail, that would be a better situation than someone who would not voluntarily express that.

Id. at 15.

22

Benson went on to note that in response to the question, "Would your views regarding the death penalty prevent you from recommending a sentence of life in prison without parole regardless of the evidence?", Trial Tr. Vol. 3 at 103, Watson asked:

> '[R]egardless of the evidence?' The Court said, '[Y]es.' [Watson's] answer was, '[W]ell, I would prefer if a person is found guilty, I would rather do the life in prison rather than the death penalty.' 'You understand that [that] would be up to you in terms of how you [would] decide?' The Court asked her that. And she said, '[Y]es.' So she's indicating a preference for life in prison."

Evidentiary Hr'g Tr. at 16-17 (quoting Trial Tr. Vol. 3 at 103).

In response to the same question, Wills' answer was, "No." Trial Tr. Vol. 3 at 62. According to Benson, Wills' answer "express[es] a neutrality on the death penalty versus leaning towards life. That is different – that's another difference between Miss Wills and Miss Watson." Evidentiary Hr'g Tr. at 18.

With respect to Wills' and Watson's sentiments on imposing the death penalty "on someone who is not the actual shooter in a crime," Trial Tr. Vol. 3 at 63, Benson stated as follows:

> Miss Watson and Miss Wills' answers were similar. I would not consider the death penalty for the non-shooter. Miss Watson said that twice. Miss Wills initially said, no, that she would have a lot of trouble with it; that she could set aside her personal view and follow the law. She offered that during that questioning. And that is consistent with her answers once again to the Court's questioning, and in her initial questionnaire that she would follow the law.

Evidentiary Hr'g Tr. at 18-9 (citing Trial Tr. Vol. 3 at 63-4, 106-07).

### b. Responses to Keith Spielfogel's Questions regarding Consideration of Defendant's Background when Imposing the Death Penalty

Benson also found it important that when Keith Spielfogel, counsel for Keon, asked Wills about "what her consideration would be of a defendant's background in determining the death

penalty," Wills said, "she would not care about the defendant's background. She would be reluctant to consider it, and she would be seeking to make a decision on the crime itself. That accrues to the government's benefit because, obviously, this Court saw, and we knew well in advance, that there was going to be a whole slew of background information presented at least as to Styles Taylor, and probably as to Keon Thomas." Id. at 19-20 (citing Trial Tr. Vol. 3 at 65-7).

Benson continued: "If the Court remembers, there was a 250 slide Power Point presentation all about Styles Taylor's background and how bad it was. So certainly the government would be looking for a witness or a juror who would be less inclined to weigh that as heavily as someone else who would. We believe that differentiates Miss Wills from Miss Watson." Id. at 20.

According to Benson, "the government wanted people [on the jury] who would not give the same weight to that type of background evidence as people who would be more inclined to believe that for the defense." Id. at 21. Therefore, for Benson, "that's a very telling comment from Miss Wills that she would not consider that background evidence very strongly, and that would accrue to the government's benefit." Id. Importantly for Benson, "Miss Watson never gave that information." Id.

### c. Juror Questionnaire Responses

Regarding Watson's answer to question 133 of the juror questionnaire, Benson noted that:

Miss Watson checked 2-D and E. E being one that would show – it reads, '[I]n a case in which the defendant is convicted [and] in which the death penalty is requested, I can vote to impose the death penalty or a sentence other than death, whichever is appropriate, based on the facts and the law [in] the case.' Sort of the most neutral answer out of that group, I think all of us can agree to that. However, she also circled D, which would show a leaning towards a reservation to impose the death penalty. Although, not a strong reservation, but somewhat of a reservation.

24

That reads, 'I am generally opposed to the death penalty. Nonetheless, I believe, I can vote to impose the death penalty if [it is] called for by the facts [and] the law [in the case].' Certainly a position that does not give rise to cause, although indicating that – an opposition to the death penalty. And she circled both of those.

Evidentiary Hr'g Tr. at 12-13 (quoting Watson Juror Questionnaire at 23).

Benson then compared Wills' response to the same question 133, pointing out that Wills' answer "references only to the circling of D, the neutral response. . . . And that says, 'I'm generally opposed to the death penalty[.] [N]onetheless I [believe I] can vote to impose [the death penalty if it is called for by the facts and the law in the case].' The most – of the most neutral position you can have. But she only circled one of those." Id. at 13 (quoting Wills Juror Questionnaire at 23).

With respect to question number 134 of the questionnaire, Benson explained that, "Miss Wills stated that, 'I don't have a strong opinion overall for or against the death penalty, but would consider myself generally against it.' Consistent with D. 'I do have a strong opinion [to] following the law. So if the law saw the death penalty as a just punishment, I would not have a problem upholding this part of the law.' I believe those two answers, in and of themselves differentiate Miss Watson and Miss Wills." Id. at 15-16 (quoting Wills Juror Questionnaire at 23).

Benson offered another distinction between Watson and Wills regarding their responses to question number 109 on the juror questionnaire. In response to question 109 concerning how a juror would view an accomplice's testimony, Watson, in Benson's estimation, "basically said, the accomplices will lie." Id. at 22 (citing Watson Juror Questionnaire at 19). Benson stated, however, that "Miss Wills had a slightly different view, and she said that it would somewhat

25

impact their credibility. Didn't believe all accomplices to be outright liars, but would rather

think it has some effect." Id. (citing Wills Juror Questionnaire at 19).

Additionally, as to Watson's and Wills' responses to question number 119 on the

questionnaire asking whether a juror would advocate any change in the gun control laws, Benson

noted that:

> Miss Wills' response was that we need more gun background checks and higher
> penalties for those caught with weapons. Compare that to Miss Watson's response,
> which was she favored gun control, but she thought convicted felons should have to
> get a permit. Those are two exactly contrary views. The concept that someone
> would advocate for convicted felons to even be allowed to have a gun is substantially
> different from someone who is just looking for higher penalties for people who are
> caught with weapons. And, obviously this was a situation where the defendants were
> convicted felons, and were trying to a steal firearm [sic] because they could not
> legally obtain those. And so, once again, there's significant differences in their views
> on guns, as well as the death penalty that led to the striking of Miss Wills.[3]

Id. at 22-23 (citing Watson Juror Questionnaire at 20; Wills Juror Questionnaire at 20).

## C. THE COURT'S CREDIBILITY DETERMINATION

### 1. Watson v. Nowak

A critical question for this Court to decide, after a thorough investigation, is whether

Benson's explanation for exercising a peremptory strike against Watson is credible and

persuasive in light of his failure to use a peremptory strike against Nowak, who appears to be a

similarly-situated Caucasian juror. Hendrix, 509 F.3d at 371 (affirming that the persuasiveness

of the proffered reason is critical to Baton's third step) (citing Miller-El I, 537 U.S. at 338-39);

Purkett, 514 U.S. at 769 (noting that the prosecutor's genuineness is key at the third stage).

---

[3] At the evidentiary hearing, Benson indicated to the Court that Wills' and Watson's
statements regarding gun control were made in response to question 116 of the juror
questionnaire. The statements were in fact made in response to question 119 of the juror
questionnaire.

26

Upon further inquiry, it is clear to the Court that Watson and Nowak are distinguishable, given the distinctions that Benson expressed at the November 3, 2008 evidentiary hearing. Benson's demeanor, coupled with his race-neutral explanations for striking Watson, which we discuss more fully below, illustrate that the government's use of a peremptory challenge as to Watson was not motivated by purposeful discrimination.

At the outset, the Court acknowledges that Benson's demeanor during the voir dire and during the November 3, 2008 evidentiary hearing was professional and candid. As the Court has expressed before, "[n]othing [Benson] said or did indicated to the court that he was not telling the truth as to the basis of the challenge. Nothing in his demeanor indicated purposeful discrimination." Minute Order of January 17, 2008. The Court adopts this statement, as before, and finds that nothing with regard to Benson's behavior or presentation during these proceedings indicated to the Court that he offered a pretext in support of his choice to exclude Watson from the jury. This is significant, as these observations weigh heavily in favor of finding Benson's explanations credible. Lamon, 467 F.3d at 1101 (explaining that the attorney's demeanor "will often provide the best evidence of purposeful discrimination.") (citing Hernandez, 500 U.S. at 365).

Turning to Benson's proffer, when looking to the juror questionnaire responses, Benson pointed out that Nowak circled answers D, E *and* F to question 133, which in his estimation indicates a stronger preference for the death penalty. Answer F, again, states that the respondent is "generally in favor of the death penalty" but can vote to impose a lesser sentence if need be. Benson correctly asserts that this is a position more favorable to the government while at the same time different from Watson, who circled answers D and E, but not F. Beyond that, Benson

noted that Nowak described in her own words her personal feelings toward the death penalty as, "I feel an eye for an eye." Nowak Juror Questionnaire at 23. Again, for Benson such a response was not only more favorable to the government, but was strikingly different from Watson's response to the same question, which indicated that Watson "believe[d]" she could impose the death penalty, but only in distinct circumstances. Watson Juror Questionnaire at 23. Taken together, Benson believed that Nowak's responses, as opposed to Watson's, worked to the government's advantage. This deduction is plausible, given that the government in death penalty cases is likely to prefer a juror that believes "an eye for an eye," without qualification, is an appropriate measure of fairness. Accordingly, Benson's race-neutral explanations regarding the juror questionnaires comport with sound trial strategy and, in turn, support a finding of credibility and indeed honesty on behalf of Benson.

Moreover, in assessing the jurors' responses to the Court's questions, Benson asserted that Nowak ultimately expressed some reservation as to whether she could impose the death penalty on a non-shooter defendant. Watson, on the other hand, expressed no reservations, stating unequivocally that she would not impose the death penalty on a non-shooter. For Benson, this indicated that "Nowak had a stronger position in support of the death penalty than [] Watson." Evidentiary Hr'g Tr. at 42. Again, the Court finds this explanation plausible, as this type of difference, even if only slight, may work to the government's advantage in a death penalty case. And, more importantly, regardless of whether Benson's assessment was accurate, his explanation was reasonable, his statements were genuine and the Court finds nothing to indicate that his choice to strike Watson on these grounds was pretextual. See Hendrix, 509 F.3d at 371; see also George, 363 F.3d at 674.

28

### 2. *Watson v. Evans*

The Court has examined the prosecution's assertions regarding the differences between Watson and Evans, and, for the following reasons, determines de novo that the prosecution's race-neutral explanation for excusing Watson but not Evans is credible. In Stephens, the Seventh Circuit indicated that a court can measure the credibility of a race-neutral explanation for removing a juror by observing the demeanor of the party offering the explanation and by inquiring into whether the explanation is reasonable and has a "basis in accepted trial strategy." 514 F.3d at 711 (quoting Miller-El I, 537 U.S. at 339).

In this case, as the Court has already explained, there was nothing in Benson's demeanor when he excluded Watson that would indicate purposeful discrimination. See Minute Order of January 17, 2008. Moreover, the Court finds that Benson's explanation for excluding Watson but not Evans was both reasonable and based in sound trial strategy. A prosecutor seeking the execution of certain defendants will obviously seek jurors with views more favorable to the death penalty. During the evidentiary hearing, Benson indicated that Watson and Evans gave different answers to question 133 of the juror questionnaire: Watson indicated either a neutral stance or a general opposition to the death penalty, while Evans indicated his support for the death penalty. Benson also noted that in answering question 135, Evans indicated stronger support for the death penalty than Watson.

In response to the Court's questions regarding the death penalty, Benson explained, Evans again indicated stronger support for the death penalty than Watson. Benson also pointed out that he perceived Watson's views regarding the question of the death penalty for the non-shooter to be different from Evans' views: Evans initially indicated that he would be reluctant to impose the

29

death penalty on a non-shooter, but that he would follow the law; Watson twice indicated that she would not consider the death penalty for a non-shooter.

The Court views Benson's explanation for excluding Watson but not Evans in its totality. See Stephens, 514 F.3d at 711; see also Pruitt ("it is a combination of factors that will determine whether a party believes a juror will be favorable to their side."). In so doing, the Court determines that Benson's proffered explanation is entirely credible. Benson's assertions during the course of the evidentiary hearing have convinced the Court that he legitimately believed there to be significant differences between Watson's and Evans' views on the death penalty. These perceived differences included differences in Watson's and Evans' opinions on the appropriateness of executing a non-shooter. Whether or not Watson and Evans actually held differing views on these matters is not an issue for the Court to determine – the relevant inquiry at this point is whether Benson actually believed the race-neutral explanation he proffered. See Hendrix, 509 F.3d at 371 (in adjudicating Batson challenges, courts are directed "to assess the honesty – not the accuracy – of a proffered race-neutral explanation."); Montgomery, 210 F.3d at 453 ("[T]he ultimate inquiry for the judge is not whether counsel's reason is suspect, or weak, or irrational, but whether counsel is telling the truth in his or her assertion that the challenge is not race-based."). The Court determines that Benson genuinely believed his explanation and that it therefore was and is credible.

### 3. *Watson v. Wills*

Upon consideration of the Miller-El I credibility factors, this Court concludes that Benson's race-neutral rationale for using a peremptory strike as to Watson, but not Wills, is credible. See Miller-El I, 537 U.S. at 339 ("Credibility can be measured by, among other factors,

30

the [offering party's] demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.").

In this Court's January 17, 2008 Order, the Court found Benson's demeanor "professional and candid" during his striking of juror Watson. Again, the Court adopts that finding here. The Court also finds reasonable the race-neutral distinctions Benson made between Wills and Watson at the evidentiary hearing. Benson argued at the hearing that although both Watson and Wills expressed reservations about the death penalty, only Wills consistently stated during voir dire and in her juror questionnaire responses that her obedience to the law would outweigh any reticence she felt towards returning a sentence of death. For example, when Watson was asked her opinion of the death penalty, she said, "I really would prefer nobody had to, you know, as far as the death penalty goes, but I don't know." Trial Tr. Vol. 3 at 102. In contrast, Wills stated that, "It's the law of the country that it's a possible penalty. I'm not really in favor of killing anyone, but I am in favor of upholding the laws of the country." Id. at 62. Later in juror questioning, Watson reiterated her reluctance to impose the death penalty on a defendant, stating, "I would prefer – if a person is found guilty, I would rather do the life in prison rather than the death penalty." Id. at 103. Wills, however, noted in her response to question 134 of the juror questionnaire that, "I do have a strong opinion following the law. So if the law saw the death penalty as a just punishment, I would not have a problem upholding this part of the law." Wills Juror Questionnaire at 23.

Similarly, with respect to the "non-shooter" question, Benson noted that Watson twice explicitly said she would not consider the death penalty for a non-shooter. Trial Tr. Vol. 3 at 106-07. Wills, on the other hand, indicated that her belief in upholding the law would outweigh her

31

reservations about sentencing a non-shooter to death. Wills initially said, "If somebody was not the actual shooter, I would have a lot of trouble saying that he would get the death penalty." Id. at 63. Then, upon further questioning, Wills stated, "[i]f the Court instructed me and I was not understanding correctly, then [my views on imposing the death penalty on a non-shooter] might change, because I do believe in upholding the law." Id. at 64.

In light of the above statements, one cannot label "implausible" or "fantastic" Benson's argument that Wills would be somewhat more inclined than Watson to believe that the death penalty was a proper punishment for a convicted defendant and, more specifically, for a convicted defendant who was a "non-shooter." See Purkett, 514 U.S. at 768 ("At [the credibility] stage, implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination"). Certainly placing people on a jury who are more likely to return a death penalty verdict accords with accepted trial strategy for a prosecutor trying a murder case. Moreover, there was no evidence to suggest that Benson was being dishonest when he offered this explanation. See Hendrix, 509 F.3d at 371 ("Batson and its progeny direct trial judges to assess the honesty - not the accuracy - of a proffered race-neutral explanation.") (citing Lamon, 467 F.3d at 1101). Therefore, Benson's distinction between Watson's and Wills' feelings toward the death penalty is credible with respect to all three Miller El I factors.

In addition, Benson credibly highlighted Wills' response to the question whether she would want to consider the defendant's background when determining whether the death penalty was warranted. Wills answered, "I don't believe so. I would rather just consider it based on the crime itself." Trial Tr. Vol. 3 at 65-6. When Wills was asked whether hearing "things" about defendants' background would play any role in her decision whether defendants would live or

32

die, she answered, "I would not think so, no." Id. Watson was silent as to the "background" question. Evidentiary Hr'g Tr. at 21. As Benson stated, "there was a 250 slide Power Point presentation all about Styles Taylor's background and how bad it was. So certainly the government would be looking for a witness or a juror who would be less inclined to weigh that as heavily as someone else who would." Id. at 20; see also id. at 21. Given that the government was aware that the defense would likely offer evidence of defendants' background in order to argue against a sentence of death, Benson's efforts to seat a juror who stated she would ignore such evidence appear to be sound trial strategy.

The Court also finds reasonable the differences Benson identified between Wills' and Watson's views on gun control. In response to question 119 of the juror questionnaire, Wills indicated that she agreed with the statement that "there should be changes in the law concerning the ownership and registration of firearms." Wills Juror Questionnaire at 20. Specifically, Wills stated that there should be, "[m]ore extensive background checks, higher penalties to those caught with weapons not authorized to have." Id. In comparison, Watson did not answer question 119 and responded as follows to question 116: "They [sic] should be gun control in that convicted felons should have a permit." Watson Juror Questionnaire at 20. Collectively, these responses provide ample support for Benson's claim that, "there's significant differences in their views on guns, . . . that led to the striking of Miss [Watson]." Evidentiary Hr'g Tr. at 23; see also id. at 22-23. Knowing that "this was a situation where the defendants were convicted felons, and were trying to a steal firearm [sic] because they could not legally obtain those," Benson's attempt to seat jurors who advocated increased penalties for unauthorized gun possession is understandable trial strategy. Id.

33

Therefore, upon review of all relevant facts, the Court finds Benson's proffered race-neutral rationale for the striking Watson but not Wills credible under Miller-El I. Benson's demeanor during the striking of Watson was "professional and candid," and his race-neutral distinctions between Wills' and Watson's views as to the death penalty and gun control were reasonable and in accordance with accepted trial strategy.

## III. CONCLUSION

In evaluating de novo the credibility of the government's proffered race-neutral explanation for striking Watson but not Nowak, Evans and Wills, the Court has examined the persuasiveness and genuineness of Benson's assertions during the evidentiary hearing. See Rice, 546 U.S. at 338; Purkett, 514 U.S. at 768. For the reasons articulated in the body of this Opinion, the Court finds that Benson's rationale was credible and that he was honest and truthful during this hearing when asserting that the challenge was not race-based.

"[T]he ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." Rice, 546 U.S. at 338 (quoting Purkett, 514 U.S. at 768). After careful consideration of all the available evidence regarding Defendants' Batson challenge, see Snyder, 128 S. Ct. at 1208, the court determines that Defendants have not carried their burden in this case. The court therefore concludes that Defendants' Batson challenge fails.

ENTER:

/S/ CHARLES R. NORGLE

CHARLES RONALD NORGLE, Judge
United States District Court

DATED: Jan. 22, 2009

34