# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# HAMMOND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 2:01 CR 73 |
| | ) | |
| STYLES TAYLOR and | ) | |
| KEON THOMAS | ) | |

## OPINION and ORDER

## I. BACKGROUND

### A. Procedural History

This case stems from the murder of 73-year-old Frank Freund ("Frank")[1] and the robbery of his gun store, Firearms Unlimited, on March 20, 2000. In 2001, defendants Styles Taylor and Keon Thomas (often referred to herein collectively as "defendants"), were indicted for these crimes, along with Thomas's cousin, Damione Thomas ("Damione"), and a friend named Adam Williams. (DE # 1.) The indictment, later superceded, charged Taylor and Thomas with conspiracy to commit robbery and murder, Hobbs Act robbery, murder during a robbery, and being felons in possession of firearms. (DE # 456.) The Government sought the death penalty against both Taylor and Thomas. (DE ## 393, 394.)

In September of 2003, Damione and Williams entered pleas of guilty. (DE # 438 & Minute Entry following DE # 460.) Approximately one year later, in September of 2004,

---

[1] In this opinion, the court has generally used last names to refer to individuals, including the defendants. However, because this case involves some instances of multiple individuals possessing the same last name, first names have been used to refer to a few individuals to avoid confusion.

the case proceeded to trial against Thomas and Taylor before Judge Charles R. Norgle. On the twenty-fourth day of trial, a jury returned a verdict of guilty on all counts. (DE # 852.) The trial continued to the penalty phase; on the thirty-eighth day of trial, the jury recommended a sentence of life imprisonment for Taylor. (DE # 924.) Afterwards, the Government withdrew its notice of intention to seek the death penalty against Thomas. (DE # 935.) Taylor and Thomas were each sentenced to life in prison. (DE ## 957, 958.)

In March of 2011, the Seventh Circuit Court of Appeals reversed and remanded for a new trial. *United States v. Taylor,* 636 F.3d 901 (7th Cir. 2011). The retrial (minus the death penalty charge) began on May 7, 2012, before Judge Rudy Lozano, but ended in a mistrial. (DE # 1134.) Judge Lozano began a new trial on May 10, 2012, and a new jury was selected. (DE # 1143.) After jury selection, this case was reassigned to the undersigned, who presided over the remainder of the trial. (DE # 1146.) On the tenth day of trial, the jury found Taylor and Thomas guilty on all counts. (DE ## 1161-62.)

After the verdicts were read, Thomas accused his trial counsel of drinking alcohol throughout the trial. (Tr. 10:155-57.)[2] The court later held a hearing on the issue and, after finding Thomas's accusations baseless, permitted Thomas's counsel to

---

[2] References beginning with "Tr." refer to the transcripts of the trial before the undersigned. The numbers that follow "Tr." provide a pinpoint citation, with the number before the colon referring to the transcript volume, and the numbers after the colon referring to the page numbers within that volume. (*E.g.*, "Tr. 10:155-57" refers to trial transcript volume 10, pages 155 through 157.) References to "Ex." refer to trial exhibits.

withdraw from the case. (DE # 1166.) Thomas was appointed new counsel for purposes of post-trial proceedings. (DE # 1170.) Thereafter, both Taylor and Thomas filed motions requesting a new trial. (DE ## 1171, 1208, 1209.)

**B.      The Evidence**

At trial, the Government presented ample evidence linking defendants to the crime and providing a basis for conviction. First, the Government presented evidence of motive. Through the testimony of numerous individuals, including Thomas's cousin, Damione; Taylor's brother, Montrell Taylor ("Montrell"); and another associate, Josh Toodle; the jury heard that Taylor and Thomas were distributing small bags of crack cocaine and marijuana at the time of the crime. (Tr. 4:196, 6:249-52, 6:23-26.) The jury also heard that Montrell, Damione, Williams, Louis Short, Bud White, and others were involved in selling with them. (Tr. 4:195-98, 6:248-52.) Police found evidence of narcotics trafficking in Taylor's residence on Field Street (Tr. 3:237, tiny ziplock baggies), and the residence on Monroe Street where Thomas was said to be staying[3] (Tr. 98-99, digital scale). Through the testimony of Thomas's cousin Damione, the jury heard that Taylor and Thomas had discussed robbery to get more drugs and guns, and ultimately to make more money. (Tr. 6:252-54.) However, at that time, Taylor and Thomas were both convicted felons (Tr. 4:57), and therefore they were unable to purchase guns legally.

---

[3] The jury heard the testimony of Thomas's uncle, Charles Thomas, who stated that in 2000, Thomas and Damione lived with him in a residence on Monroe Street. (Tr. 4:234.) The Government also presented evidence that Thomas had registered his car insurance at the same Monroe Street location. (Tr. 4:101-02.) Louis Short testified that Thomas stayed at another location on Becker Street "on and off." (Tr. 4:293.)

According to the Government, this provided defendants with a motive to rob a firearms store.

The Government also presented evidence tying defendants to the crime scene. For example, the testimony of eyewitnesses corroborated the testimony of defendants' associates regarding defendants' attire and mode of transportation on the day of the robbery and murder. Damione testified that at around 11:00 or 11:30 a.m. on March 20, 2000, Thomas went to Taylor's house and asked Taylor if he was ready to go. (Tr. 6:258-59.) Damione further testified that Taylor then changed into a plain black hoodie and pants, and Taylor and Thomas left in Thomas's car. (Tr. 6:260.) Damione testified that Thomas drove a beige, four-door Cadillac with a brown roof. (Tr. 6:258.) At approximately 12:40 or 12:45 p.m., two witnesses saw a brownish Cadillac parked outside Firearms Unlimited; one of them saw an individual wearing a black sweatshirt rummaging around inside the car. (Tr. 3:120-122, 4:64-66.) And there was additional evidence that Thomas's car was at the scene that day: a forensic expert testified that tire tracks found at the scene were consistent with Thomas's Cadillac. (Tr. 8:116-19.) Thomas later admitted, in a videotaped statement, that his car was used in the robbery, although he stopped short of admitting that he was involved in the robbery himself. (Tr. 7:240, Ex. 47b.)

Evidence was also presented linking a gun consistent with the murder weapon to defendants. The jury heard ballistic experts testify that a Glock 9-millimeter was the murder weapon. (Tr. 8:89-91, 124, 129.) The jury also heard a videotaped statement by

Thomas, in which he admitted that he obtained a Glock 9-millimeter at the end of February or beginning of March of 2000. (Tr. 7:233, Ex. 47b.) Toodle testified that three or four days after the homicide, Thomas and Williams came to his house and Williams asked him if he was interested in buying a Glock 9-millimeter. (Tr. 4:198-99.) Later, Thomas admitted via his videotaped statement that after the date of the crime, he took a Glock with him on a Greyhound bus up to Minneapolis, scattered the ammunition from it in a park, and buried the gun; when a maintenance man later found it, Thomas took it back from the maintenance man and sold it to an unknown individual in Minneapolis for $150. (Tr. 7:232-33, Ex. 47b; Tr. 7:65-70.) As for Taylor, a crime scene investigator testified that some of the ammunition recovered in a search of Taylor's residence was similar to the bullet casings recovered at the murder scene, in that they were both 9-millimeter Lugar rounds that had been manufactured by FC (Federal Cartridge). (Tr. 3:228-30, 243; Ex. 11a-c, Ex. 17.)

The trial record also included evidence that both defendants admitted, after the fact, to involvement with the crime. At least four individuals testified that, in the days following the robbery and homicide, Taylor told them that he had pulled off or hit a "lick" (understood by all witnesses to mean that he conducted a robbery) at the gun store and killed the gun store owner in the process. (Tr. 6:52, 8:31-32 (Taylor told Montrell that he hit a lick and killed gun store man); Tr. 6:267-70 (Taylor told Daimone that he pulled off a lick, held the gun store owner up, and then shot him twice when he seemed to move his hand from the counter); Tr. 7:146, 149-51 (Taylor told Warren

Barconia, a jewelry-seller from Chicago, that he hit a lick, made the front page, hit the gun store, and when the guy in the gun store looked like he was going to reach for his own gun, Taylor shot him twice, grabbed some guns, and left); Tr. 5:56 (Taylor told Precious Walker, a friend of defendants', that he and another person had robbed the gun store and killed the old man who was in the store).) Thomas admitted his involvement too; Louis Short testified that several days after the crime, Thomas, Taylor, and Short were at the Becker Street residence, smoking marijuana and drinking, and Thomas told him that he had "hit a lick." (Tr. 4:306-08.)

The Government further presented evidence linking guns originating from Firearms Unlimited to Thomas. Through the testimony of Thomas's cousin, Damione, the jury heard that the same day as the robbery and homicide, Thomas gave Damione a baby blue Smith and Wesson case containing a "Tec 9" (Intratec 9-millimeter) at the house on Monroe Street. (Tr. 6:261-63.) Damione hid the Tec 9 in the crawl space of that residence. (Tr. 6:263-64.) The Chief of Police for the Hammond Police Department testified that a March 30, 2000, search of the Monroe Street residence resulted in the discovery of a blue handgun case containing an Intratec 9-millimeter handgun in the home's crawl space. (Tr.4:87-91; Ex. 32A-B.) The Police Chief further testified that this was also one of the guns that was stolen from Firearms Unlimited on March 20. (Tr. 4:91-92; Ex.32A-B.)

Additionally, Frank's personal firearm, a Colt .45 with chrome and an eagle on the grip, was linked to Thomas. Toodle testified that three or four days after the crime,

he went to the Becker Street residence, where Thomas and Williams pulled guns out of a duffle bag. (Tr. 4:201-03.) Toodle testified that he gave Thomas $150 for a Colt .45 with chrome and an eagle on the grip (Tr. 4:202, 207), although Louis Short claims he got money from Toodle and while Toodle waited on the front porch of the Becker Street residence, he purchased the .45 with chrome and "fancy" grips that looked like an eagle from Thomas on Toodle's behalf. (Tr. 4:301.) The same gun was identified by Frank's son as Frank's personal firearm. (Tr. 3:107-08, Ex. 1b.) The Colt eventually turned up in a search of the residence of James Askew (Precious Walker's close friend, whom she referred to as her cousin) (Tr. 3:232-35), though it is not clear whether Askew acquired it from Thomas via Toodle, or from Taylor. Toodle testified that once he heard about the robbery, he wanted to get rid of the Colt he had just purchased from Thomas right away, so he sold it to Askew, whom he knew from the area (Tr. 4:203-05), but Precious Walker also testified that Taylor told her he sold one of the guns he stole from the gun store to Askew. (Tr. 5:56.)

The Government presented evidence that, in the days following the robbery and homicide, defendants were eager to sell guns. Warrant Barconia, the Chicago jewelry-seller, testified that Taylor and Thomas discussed with him the fact that they were going to sell guns in Chicago, and they also asked Barconia if he knew anyone who wanted to buy guns. (Tr. 7:157-58.) Thomas's cousin, Damione, testified that the evening of the day of the homicide, Thomas said that he and Taylor were going to trade the guns they stole for a quarter kilo of cocaine in a deal with a person named "Bone." (Tr.

6:271-72.) Daimone further testified that the day after the homicide, both defendants

met with Montrell and Damione, and Thomas said that the deal with Bone fell through.

(Tr. 6:274-75.) Similarly, Louis Short testified that Thomas said that someone was

supposed to buy all the guns from him, but the transaction did not work out. (Tr. 4:309-

10.) Short also testified that Thomas told him that he had some 9-millimeter and .380

guns for sale (Tr. 4:297-98, 304), and asked if Short knew anyone else who wanted to

buy guns, which he did not want to sell around the neighborhood because they would

probably "come back to him [Thomas]." (Tr. 4:305.)

Evidence was also presented suggesting attempts by Thomas to cover up the

crime. On the day after the homicide, Thomas transferred ownership of the Cadillac to

his friend, Adam Williams. (Tr. 4:112-14, Ex. 39.) The jury also heard from an auto body

painter who testified that after the robbery, Williams took the Cadillac to be repainted a

different color. (Tr. 7:5-13, Ex. 44a-c.) Thomas admitted, in his videotaped statement, to

getting the car repainted because of the robbery. (Tr. 7:241.) Thomas also fled to

Minnesota after the Monroe Street residence was searched by police and a gun from

Firearms Unlimited was discovered. The jury heard Thomas's half-sister, Tanikka Jones,

testify that on March 31, 2000, the day after the search of the Monroe Street residence,

Thomas went to Minneapolis, Minnesota, to stay with her for a few days, even though

she had not seen him in years. (Tr. 7:44-48.) After Jones kicked Thomas out, Thomas

stayed with other relatives in Minneapolis for the next two months until he was

arrested. (Tr. 7:53-54.) In his videotaped statement, Thomas admitted that he went up to

Minneapolis because he knew that guns from Firearms Unlimited were recovered at the Monroe Street residence. (Tr. 7:237; Ex. 47b.)

## II.     LEGAL STANDARD

Defendants have moved for a new trial. FEDERAL RULE OF CRIMINAL PROCEDURE 33(a) gives district courts the discretion to grant a new trial "if the interest of justice so requires." RULE 33(a) does not define "the interest of justice," and "the courts have had little success in trying to generalize its meaning." *United States v. Kuzniar,* 881 F.2d 466, 470 (7th Cir. 1989). "Nevertheless, courts have interpreted the rule to require a new trial . . . in a variety of situations in which the substantial rights of the defendant have been jeopardized by errors or omissions during trial." *Id.* RULE 33(a) is reserved for only the most extreme cases. *United States v. Hagler,* 700 F.3d 1091, 1101 (7th Cir. 2012).

## III.     DISCUSSION

### A.     References to Arthur Vibanco in Closing Arguments

Defendants' first argument is that the Government improperly made references to Arthur Vibanco during its closing arguments. At the time of the crime, Vibanco was twelve years old and lived across from Firearms Unlimited. During opening statements, Taylor and Thomas suggested to the jury that Vibanco would provide eyewitness testimony demonstrating that someone else must have robbed the store and murdered Frank — specifically another individual, now deceased, named Bud White.

Taylor's opening statements described in detail the testimony that Taylor expected from Arthur Vibanco regarding the vehicle Vibanco purportedly saw at Firearms Unlimited on the day of the murder:

> There are eyewitnesses that see vehicles at Firearms Unlimited; and those vehicles, the evidence will show, do not match any vehicles that Mr. Taylor owns or drives or hangs out with. There is an eyewitness to this crime who is a fifth grader. His name is Arthur Vibanco. The government chooses their witnesses. I'm not sure if they will call Mr. Vibanco. I can assure you that the defense will call Mr. Vibanco. Mr. Vibanco was in fifth grade. He was seated at a window perched right across the same side of the street as Firearms Unlimited, and he saw a Cadillac with blue doors and damage to a left fender headlight and five – approximately five individuals getting out of that vehicle and going into Firearms Unlimited. He heard two shots, and he saw these individuals leaving. They were wearing sweatshirts -- hooded sweatshirts. Arthur Vibanco was interviewed on at least three occasions by officers. On March 22nd, he's interviewed by ATF Officer Mike Solan and Hammond Detectives Paul Dancer and Robert Repay.

(Tr. 3:54-55.) Taylor's counsel also referenced additional unsworn statements given by Vibanco to various members of the Hammond Police Department:

> On March 23rd [Vibanco] was interviewed by Hammond Detective Brian Miller, Mark Gootee, and ATF Agent Cindy Carroll. And on May 4th of 2000 he's interviewed by Eric Ellis, Special Agent Eric Ellis and Hammond Police Captain Mike Solan Jr. He indicates to them that he saw five males standing around the four-door late model Cadillac with two blue doors damaged to the left. A short time later after the robbery, he sees a yellow Cadillac park in front of the store. Someone goes in and comes running back out. On May 4 of 2000, Mr. Vibanco is showed picture [sic] of a Cadillac that belongs to a man by the name of Charles "Bud" White, and he identifies there are two doors of a different color, the blue doors, and the damage to the headlights. . . . There is no evidence recovered that Styles Taylor has anything to do whatsoever with this car or this group of people. Bud White, the man who owned this car, is shot to death between March 20 of 2000 and May 4 of 2000 when Arthur Vibanco identifies his car.

(Tr. 3:55-56.)

Thomas's counsel also emphasized the importance of Vibanco's testimony and provided details of the vehicle Vibanco allegedly saw at Firearms Unlimited:

> Well, ladies and gentlemen, as [Taylor's counsel] told you, there's two sides to every story because you're going to hear from Arthur Vibanco that it was a Cadillac with blue doors that was observed at Firearms Unlimited, not the beige Cadillac. You are going to hear that Bud -- Charles White owned a blue Cadillac at the time of the robbery, and you're going to hear that shortly after the robbery Charles White's blue Cadillac is disposed of. . . . You're going to hear from Mr. Vibanco that five people jump out of the car, go into Firearms Unlimited. He hears shots. Those five people run out, jump back in the Cadillac, and speed away; and you're going to hear that Keon Thomas is not one of those persons.

(Tr. 3:73-74.)

During trial, Taylor called Vibanco to the stand. However, Vibanco had no memory of any observations he may have made at the time. (Tr. 8:227.) Taylor's counsel attempted to refresh his recollection with police reports (Tr. 8:228), but Vibanco still had no recollection of any of the events related to the homicide. (Tr. 8:228-30, 232.) Taylor's counsel then called Agent Ellis to the stand and, through him, tried to admit the interview statements Vibanco had given to Agent Ellis 12 years earlier. (Tr. 8:237-40.) The Government objected, and the court took the issue under advisement during an evening recess. (Tr. 8:241-43.)

Over the evening recess, the Government contacted Taylor's defense counsel (Tr. 9:6-7), reminding him of the proffer Taylor made during plea discussions under FEDERAL RULE OF CRIMINAL PROCEDURE 11 in April of 2001. The Government's letter, which accompanied the proffer, apparently stated that if Taylor presented evidence inconsistent with the proffer, then the Government would be allowed to use the proffer

against Taylor. (Tr. 9:3-4.) The Government believed Taylor's attempt to introduce

Vibanco's statements was contrary to his proffer, opening the door for the Government

to introduce the proffer to the jury. When court resumed the next day, this discussion

was relayed to the court and Taylor moved to withdraw his offer of Vibanco's

statements to the jury and to strike Vibanco's testimony and Agent Ellis's testimony

related to Vibanco. (Tr. 9:8-13.) The court granted the motion and instructed the jury

accordingly. (Tr. 9:24-25.) Without Vibanco's testimony, there was no identification of

Bud White's car at the scene of the crime, nor any identification of the perpetrators

according to Vibanco.

Later, during closing arguments, the Government said to the jury:

> So I really don't know what the defendants were gonna talk about in their
> opening about Mr. Vibanco seeing some other car there; but, obviously, that
> never came to fruition.

(Tr. 10:36.) Then, during rebuttal, the Government told the jury:

> Originally in opening it started off as Arthur Vibanco seeing a different car.
> Well, we all saw that didn't materialize, did it?

(Tr. 10:82.) The Government also stated:

> But why is there talk of Bud White when there's no evidence at all that he
> sold any guns, that he was present, that his car was present? Why is there
> talk of Arthur Vibanco when there's no evidence that he has anything to do
> with this case? It's to get to you focus not on the evidence that you saw but
> to get you to speculate and wonder. Both sides have the same power to
> subpoena witnesses. The defendants have no obligation. The government has
> the burden of proof, and it should be that way. And we've brought in all the
> witnesses who had something to say about what these two defendants did.

(Tr. 10:86-87.)

Defendants argue that the Government, in its closing arguments, improperly commented on facts not admitted into evidence because, ultimately, Vibanco's testimony was stricken and the exhibits related to him were withdrawn. The court must analyze claims of prosecutorial misconduct using the two-step framework established in *Darden v. Wainwright,* 477 U.S. 168, 181-82 (1986). *United States v. Gilbertson,* 435 F.3d 790, 796 (7th Cir. 2006). The first question is whether the Government's comments were improper. *Id.* If so, then the court must decide whether the comments prejudiced the defendant. *Id.*

Regarding the propriety of the Government's comments, the Seventh Circuit considered a case similar to this one in *United States v. O'Brien,* 618 F.2d 1234, 1242 (7th Cir. 1980). In opening statements, O'Brien's counsel had stated that Fred Appel, an employee of O'Brien, would testify at trial that Appel gave one of the false credit references attributed to O'Brien by the Government. Appel never testified at trial. During closing arguments, the Government posed a rhetorical question: "Where is Fred Appel?" The Seventh Circuit held that the Government did not err in making such a statement, and noted that it was "clearly fair comment," given the promises made by defense counsel during opening statements. *Id.*

Similarly, in this case, counsel for both Taylor and Thomas told the jury during opening statements that they would hear from Vibanco about the type of car that he saw outside of Firearms Unlimited and about a group of men that he saw coming and going from the store. (Tr. 3:54-55; Tr. 3:73-74.) Vibanco testified to no such facts.

Accordingly, the Government's commentary on the lack of testimony from Vibanco was not improper. The Government did not misstate the evidence, nor the parties' respective burdens of proof. Defendants did not deliver on what their opening statements suggested regarding Vibanco's testimony, and the Government was entitled to make "fair comment" on that fact in its closing arguments. *O'Brien,* 618 F.2d at 1242. Nor was it improper for the Government to comment on the defendants' abilities to subpoena or call witnesses. Such comments are permissible so long as they do not invite an inference based on the defendant's own silence. *United States v. Sblendorio,* 830 F.2d 1382, 1393 (7th Cir. 1987) (prosecutor's observation that defense could produce witness if it wished was not forbidden, as it does not alter the burden of proof or penalize the exercise of a constitutional right).

Defendants repeatedly emphasize that Vibanco's testimony was stricken and the exhibits related to him were withdrawn, arguing that the Government's commentary on this evidence was improper. It is true that "counsel cannot rely or comment on facts not in evidence during closing arguments." *United States v. Henry,* 2 F.3d 792, 795 (7th Cir. 1993). However, in this case the Government did not comment on any facts not in evidence during closing arguments. The Government did not mention the substance of any of Vibanco's stricken testimony, nor did it reference the contents of the withdrawn exhibits. The Government only commented on the defendants' failure to come through on the promises made during their opening statements, which it was permitted to do

under *O'Brien*. Accordingly, the court finds that the Government's comments regarding Vibanco during closing statements pass the first step of the two-step *Darden* framework.

At this point, no further analysis is actually necessary. However, for defendants' benefit, the court notes that even if the Government's comments were improper, thus causing the Government to fail the first step of the *Darden* framework, such a finding would only be the first step in the process of determining whether the Government had engaged in prosecutorial misconduct. The court must still determine whether the defendants were prejudiced by the Government's comments. "Six factors guide the prejudice inquiry: 1) whether the prosecutor misstated the evidence; 2) whether the remarks implicated specific rights of the accused; 3) whether the defense invited the response; 4) the trial court's instructions; 5) the weight of the evidence against the defendant; and 6) the defendant's opportunity to rebut." *United States v. Gilbertson,* 435 F.3d 790, 796-97 (7th Cir. 2006).

As to the first and second factors, the Government's comments did not misstate the evidence, nor did they implicate other specific rights of the accused such as the right to counsel or the right to remain silent. The third factor also weighs in the Government's favor, because given defendants' opening statements, the Government's comments during closing arguments were clearly "invited." *Darden,* 477 U.S. at 182 (holding that Government's comment was "invited by or was responsive to the opening summation of the defense"). The Government's comments regarding the parties' powers to subpoena and present witnesses were also invited by the fact that Taylor

initially introduced Vibanco to the jury as a witness, and then later moved to strike his testimony when it became obvious that it would not be beneficial to continue. *See Sblendorio,* 830 F.2d at 1394 ("prosecutor was entitled to ask the jury to draw its own conclusions from the defendants' choices in the conduct of the trial"). The fourth factor also weighs in the Government's favor, as before closing arguments began, this court instructed the jury that "what these lawyers say during their final arguments, that is not evidence; and you will disregard what they say unless it's supported by the evidence that you saw and that you heard during the presentation-of-evidence phase of this case." (Tr. 10:4.) The court read a similar instruction to the jury after closing arguments, before they began deliberating. (Tr. 10:98-99.) The Seventh Circuit entertains a presumption that such instructions are taken seriously. *United States v. Neely,* 980 F.2d 1074, 1087 (7th Cir. 1992).

The fifth factor also bolsters the Government's position; the weight of evidence against the defendants was substantial. Vastly simplified, the Government presented evidence of a motive to obtain more guns to fuel defendants' drug business; firmly linked Thomas's car to the crime scene; provided the testimony of an witness who saw Thomas ask Taylor if he was ready to go on the day of the murder and saw Taylor subsequently change into a black hoodie and pants; provided the testimony of another individual who saw someone dressed in a similar manner as he was rummaging around inside a car matching Thomas's at the scene; provided evidence that Thomas acquired a gun consistent with the murder weapon prior to the crime and tried to

dispose of the same after the crime in Minneapolis; demonstrated that a search of Taylor's home turned up ammunition consistent with casings found at the scene; provided four witnesses who testified that Taylor admitted his involvement to them, and an additional witness who testified that Thomas admitted his involvement to him; provided evidence that a "Tec 9" from Firearms Unlimited was traceable back to Thomas, and evidence that Frank's personal Colt .45 was traceable to Thomas according to two witnesses, and to Taylor according to another witness; presented ample evidence regarding defendants' attempts to sell off guns after the date of the robbery; and demonstrated Thomas's extensive endeavors to apparently cover-up his connection to the crime, including transferring his car's title, having his car painted, and fleeing to Minnesota and hiding (and later selling) a gun consistent with the murder weapon there. In sum, the Government provided extensive evidence demonstrating defendants' guilt, and the Government's references to Vibanco's lack of testimony, even if it could be said that they were made in error, would have constituted only a pebble on the Government's pile of a case against them in the minds of any juror.

Finally, with regard to the sixth factor, though defendants may not have had a chance to attack the comments made in the rebuttal portion of the Government's closing argument, the Government's rebuttal comments were substantially similar to the comments made in the first part of its closing argument, which defendants *did* have a chance to address. In other words, any attempts by defendants to attack the comments made by the Government in the first part of its closing would have been equally

effective at disarming the later comments made by the Government during its closing rebuttal. But even if defendants did not have a good chance at rebutting the Government's comments, the other five factors all lean strongly in the Government's favor. Thus, an analysis of the *Gilbertson* factors shows that defendants were not prejudiced by the Government's statements. Thus, the Government survives both the first and second parts of the *Darden* test, and the court finds no merit in defendants' argument that the Government made improper comments regarding Vibanco during its closing arguments.

**B.      References to Louis Short's Testimony in Closing Arguments**

Taylor also argues that the Government improperly characterized the testimony of Louis Short. Louis Short was an individual who sold drugs out of the Becker Street residence with Williams. (Tr. 4:293.) Short was called to testify at trial before the undersigned, but due to Short's memory loss, he was declared "unavailable" and his previous trial testimony was read to the jury. (Tr. 4:282-83.) Through Short's prior testimony, the jury heard that several days after the crime, Thomas, Taylor, and Short were at the Becker Street residence, smoking marijuana and drinking, and Thomas told him that he had "hit a lick." (Tr. 4:306-08.) Short's testimony was specifically altered so that the jury only heard that Thomas said that he had hit a lick, not Taylor, in order to avoid any violation of Taylor's Sixth Amendment right to confrontation under *Bruton v. United States,* 391 U.S. 123, 124 (1968).

Despite the fact that Short's testimony had been *Brutonized* for the jury, during closing arguments, the Government stated: "And [Louis Short's] transcript that was read to you indicated that Keon *and Styles* admitted to the robbery and the murder of Frank Freund." (Tr. 8:17-18, emphasis added.) (Notably, Taylor did not object to the Government's statement during closings or at any point during the trial.) The Government admits that it inaccurately referenced Short's *Brutonized* testimony by referring to both Thomas and Taylor in closing arguments. However, the Government argues that the error was harmless.

Taylor's argument has two facets. First, Taylor argues that his Sixth Amendment right to confrontation was violated when the Government summarized Short's statement as including admissions by both Styles and Thomas, instead of just Thomas. However, an attorney's remark during closing arguments is not "testimonial evidence" under the Confrontation Clause, *United States v. Taylor,* 509 F.3d 839, 850 (7th Cir. 2007), so this argument fails.

Second, Taylor essentially claims that the Government's misstatement amounts to prosecutorial misconduct. As explained above, the two-step *Darden* test applies to claims of this nature. 477 U.S. at 181-82. The first step is determining whether the Government's comment was improper, and in this case, the Government has already admitted that it was. The second step requires consideration of the six *Gilbertson* factors outlined above to determine whether the defendant was prejudiced by the error. *Id.* at 182; *Gilbertson,* 435 F.3d at 796-97.

In this case, it is uncontested that the Government misstated Short's *Brutonized* testimony and that Taylor's Sixth Amendment right to confrontation was implicated by the statement, so the first two factors weigh in Taylor's favor. The comments were also not invited by defendant, so the third factor weighs in Taylor's favor as well.

However, the remaining three factors weigh strongly in the Government's favor. The court's instructions — specifically, that the lawyers' statements are not evidence (Tr. 10:4, 98-99) — significantly ameliorated any harm that might have been caused by the Government's misstatement, meaning the fourth factor weighs in the Government's favor. The fifth factor — whether the other evidence introduced at trial weighed heavily against the defendant – also tilts the scale in the Government's favor. As Taylor himself admits, at least four other parties (Precious Walker, Montrell Taylor, Damione Thomas, and Warren Barconia) claimed that Taylor had admitted to participating in the robbery and shooting. Thus, it is quite unlikely that the Government's misstatement during closing arguments as to Louis Short's testimony was the tipping point regarding Taylor's guilt for any of the jurors in this case. Finally, as to the sixth factor, Taylor had an opportunity to either object to the misstatement or to rebut the Government's misstatement in its own closing statement. Taylor did neither. When all of the six *Darden* factors are considered, it is clear that Taylor was not prejudiced by the Government's misstatement. Accordingly, the court rejects Taylor's argument that the Government's misstatement regarding Louis Short's testimony amounted to prosecutorial misconduct.

## C.  References to Precious Walker's Testimony in Closing Arguments

Defendants also argue that the Government mischaracterized Precious Walker's testimony. (DE # 1208 at 16.) At trial, Walker testified that Taylor told her that he had sold Walker's "cousin," James Askew, a gun that came from the robbery. (Tr. 5:56.) Frank's personal firearm, a Colt .45, was found during a search of Askew's residence. (Tr. 3:232-35, Ex. 1b.) During closing arguments, the Government stated: "And [Walker] also said that Taylor told her that he sold one of the Firearms Unlimited guns to her cousin James Askew. We know that's true because look where they end up." (Tr. 10:27.)

Defendants argue that Walker's statement that Taylor sold a gun to Askew was "disproved" by the testimonies of two other witnesses, Josh Toodle and Damione Thomas, who both testified that they were responsible for selling guns to Askew. (Tr. 4:203-05, Toodle testified to selling Askew a Colt .45 after he heard about the robbery, in order to get rid of the gun right away; Tr. 280-83, Damione testified to selling Askew a Smith and Wesson 9-millimeter and another 9-millimeter.) Accordingly, defendants claim, the Government falsely characterized Walker's testimony.

The two-step *Darden* test once again applies. 477 U.S. at 181-82. The first step requires the court to determine whether the Government's comment was improper. It was not. Prosecutors are permitted to "'argue reasonable inferences from the evidence that the jury has seen and heard.'" *United States v. Klebig,* 600 F.3d 700, 718 (7th Cir. 2009) (quoting *United States v. Waldemer,* 50 F.3d 1379, 1383 (7th Cir. 1995)). Walker testified that Taylor told her that he sold a gun stolen from the gun shop to Askew. The

evidence also revealed that Frank's Colt .45 was later found in a search of Askew's residence. Given this, it is perfectly reasonable for the Government to argue that the jury should believe Walker, infer that the gun in question was Frank's Colt .45, and conclude that Taylor in fact did sell it to Askew. Walker's testimony "'bears logical and proximate connection to the point the prosecutor wishes to prove,'" and the Government's statement advocated a reasonable inference. *Klebig,* 600 F.3d at 718 (quoting *Waldemer,* 50 F.3d at 1384). Because the Government did not err, the first step of the *Darden* test is resolved in the Government's favor.

Even if the Government had erred, defendants would not prevail on the second step of the *Darden* test. Again, during the second step, the court must determine whether the defendants were prejudiced by the alleged error. *Darden,* 477 U.S. at 181-82. In the Seventh Circuit, courts are to employ the six *Gilbertson* factors to determine whether prejudice occurred. *Id.* at 182; *Gilbertson,* 435 F.3d at 796-97. It is not clear that the defense invited the Government's comments, meaning that the third factor may weigh in favor of the defense. And as to the sixth factor, the fact that the Goverment's comments came during the rebuttal portion of its closing arguments meant that defendants were not able to respond during their own closings.

Other than these two considerations, however, all of the factors weigh in the Government's favor: the Government did not mischaracterize the evidence (factor 1), no constitutional right was implicated (factor 2), the court instructed the jury that the lawyer's arguments were not evidence (factor 4), and the weight of evidence against

defendants was significant (factor 5). Considering all of these factors, the court determines that defendants were not prejudiced by the Government's purported error. Accordingly, the court rejects defendants' argument that the Government mischaracterized Precious Walker's testimony in its closing argument.

###### D. Cumulative Effect of Government's Purported Errors

Defendants argue that the cumulative effect of the above-described alleged errors (misstating and/or mischaracterizing the evidence regarding Vibanco, Short, and Walker) justifies a new trial. A defendant seeking to demonstrate cumulative error "must show that there were at least two errors committed during the course of the trial and those errors 'so infected the jury's deliberation that they denied [him] a fundamentally fair trial.'" *United States v. Courtright,* 632 F.3d 363, 372 (7th Cir. 2011) (quoting *United States v. Avila,* 557 F.3d 809, 821-22 (7th Cir. 2009)). Further, relief is appropriate only if "'the errors, considered together, could not have been harmless.'" *Id.* (quoting *Alvarez v. Boyd,* 225 F.3d 820, 825 (7th Cir. 2000)).

As explained above, the Government committed no errors, save the one misstatement the Government admits it made regarding the testimony of Louis Short. One error cannot satisfy *Courtright*. And even if two or more independent errors could be found, as explained in detail above, there was such an abundance of evidence of defendants' guilt that any combination of the alleged errors could not have had an "appreciable impact on the jury's verdict." *Courtright,* 632 F.3d at 372 (even assuming multiple errors occurred, no denial of fair trial due to abundance of evidence of guilt).

Accordingly, defendants' argument regarding the cumulative effect of the Government's purported errors has no merit.

### E. Firefighter References and Spectator Conduct

Defendants' final argument — first advocated by Thomas and later adopted by Taylor as well — is that numerous references to firefighters during witness testimony and the presence of firefighters in the courtroom audience on the final day of trial deprived defendants' of their right to a fair trial because one of the jurors was a former fire chief. Defendants' argument focuses on the juror identified during jury selection as Juror # 3, who was employed by the East Chicago Fire Department for 32 years and served as Fire Chief for the City of East Chicago for approximately six years. (Tr. 1:20-21, 97.)

During trial, the victim's son, James Freund, testified that he was employed by the Hammond Fire Department. (Tr. 3:95-96.) James testified that on the day of the crime, he dropped off a sandwich for his father at Firearms Unlimited, which was attached to his father's residence. (Tr. 3:98-99.) James further testified that upon returning home, he got a phone call from a fellow fireman who had heard a call come in from dispatch, recognized the address at issue as belonging to James's father, and called James to let him know. (Tr. 3:99-100.) James testified:

> Well, I -- you know, the phone call came in; and I got on the phone. It was a fellow fireman that I work with from another station, and he had actually recognized the address because that's where I grew up at. And, you know, when you --when you're a fireman and you work with guys for 24 hours a day you know where their families are, you know their family history. It is a brotherhood, and there is a lot of camaraderie. And he recognized the

address as the call was being dispatched, picked up the phone and called my home address to let me -- you know, aware of the situation. And he said, hey, you know, we got a call for an MI or heart attack at your dad's house.

(Tr. 3:99-100.) James then went over to the scene, where the fire department had already arrived. (Tr. 3:100.)[4] James was permitted into the crime scene, and testified that it would have been unusual for the firemen to let him go inside, had he not been a fireman himself. (Tr. 3:100.) James testified that he knew just by looking in the other firemen's eyes that the situation was grave. (Tr. 3:101.) He then saw his dad, having taken only one bite of his sandwich, on the floor behind the counter in a pool of blood. (Tr. 3:101.) No objections were made by defendants to any of James's references to firefighters.

Diana Freund, James's wife and Frank's daughter-in-law, also testified. (Tr. 3:78.) Diana testified to accompanying James to drop a sandwich off for Frank at his gun shop. (Tr. 3:82.) She also testified that she answered the phone upon returning home, and one of James's coworkers from the fire department told her there was an emergency call regarding Frank's residence, at which point she handed the phone to her husband. (Tr. 3:86.) Diana testified that she and James got back in the car to drive to Frank's, and they could see emergency vehicles coming behind them from another fire station that was in that direction. (Tr. 3:87.) She further stated that a fire truck was in front of the store and a fireman was standing outside when they arrived. (Tr. 3:87.)

---

[4] A customer who had discovered Frank's body and a battalion chief for the Hammond Fire Department also testified that the fire department was the first to arrive on the scene, followed shortly thereafter by the police department. (Tr. 3:116, 147.)

They walked into the store, where three more firemen were standing, blocking her view of the murder scene. (Tr. 3:87-88.) She watched her husband look behind the counter to where her father-in-law was obviously laying, and said he looked devastated. (Tr. 3:89.) Diana then testified: "So I asked the firefighters, you know -- because we've known them all for a long time, you know; and I said, Well, you know, did you try anything? Did you do anything?" (Tr. 3:89.) When asked who else showed up at the scene, Diana testified that family members arrived, and "[t]here was other people from the fire department. There was police officers everywhere. Once we walked out of the store, we weren't allowed to go back in. So we stayed out. There was a ton of people all around, yes." (Tr. 3:91.) Again, no objections were made by defendants to Diana's references to firefighters.

A Hammond Fire Department battalion chief, Donald Koerner, also testified about responding to the crime scene on March 20, 2000. (Tr. 3:145-52.) Koerner stated that he knew James well. (Tr. 3:148.) Koerner described the condition of the scene, the position and condition of Frank's body, and the extent to which he attempted to prevent contamination of evidence at the crime scene. (Tr. 3:148-52.) Defendants did not cross-examine Koerner (Tr. 3:152), nor did they object to Koerner's references to the fire department or firefighters.

Defendants essentially argue that the references to firefighters in the tesitmony of these witnesses were excessive, and were embedded in the testimony of these witnesses in order to pressure Juror #3 to side with the Government. Defendants support their

argument by claiming that in the 2004 trial, the Government called a lower-ranking firefighter to describe the efforts of first-responders and Diana mentioned firefighters fewer times. Defendants cite no law in support of their argument about the firefighter-related testimony, and with good reason. The argument borders on frivolous. All of the aforementioned testimony was entirely relevant to this case, and references to firefighters were not excessively made. Certainly, there is no indication that the "substantial rights of the defendant[s] have been jeopardized" by the aforementioned testimony. *Kuzniar,* 881 F.2d at 470.

But defendants' argument regarding Juror # 3 focuses on the above-described firefighter-related testimony only as a peripheral matter. Their real argument appears to hinge upon their allegation that, during closing arguments on the final day of trial, 20 firefighters sat in the audience section of the courtroom "in firefighter apparel, displaying the fire department logo on their chest." (DE # 1208 at 4.) Defendants argue that these firefighters attended closing arguments in order to pressure Juror # 3, a member of their firefighter "brotherhood," to side with the Government.

It is important to point out that at no point during trial proceedings did either defendant object in any way to the presence of the firefighters in the courtroom on the last day of trial. Accordingly, no record exists as to precisely how many firefighters were present in the courtroom. Nevertheless, no evidentiary hearing is necessary on this issue. It is within the sound discretion of the district court to decide whether or not a hearing is necessary to a determination on a request for a new trial. *United States v.*

*Hedman,* 655 F.2d 813, 814 (7th Cir. 1981). Further, a district court, when entertaining a motion for a new trial, may rely on knowledge gained while presiding over the trial. *United States v. Tucker,* 836 F.2d 334, 337 (7th Cir. 1988). The undersigned was present during trial, including closing arguments, and witnessed all of the facts alleged by defendants in support of their argument on this point. Thus, the court accepts as true that the situation was as defendants claim – that approximately 20 firefighters in firefighter apparel sat in the gallery section of the courtroom during closing arguments. Even given these facts, and even when these facts are combined with the aforementioned firefighter-related testimony, the court finds that the defendants were not denied a fair trial for the reasons set forth below.

The court begins with defendants' assertion that this court should apply the "inherent prejudice" test applied by the United States Supreme Court to government-sponsored courtroom action. The Supreme Court has held that some state-sponsored courtroom practices are "inherently prejudicial" to a defendant's fair trial rights, and can only be justified by an "essential state interest." *Holbrook v. Flynn,* 475 U.S. 560, 568-69 (1986) (presence of four uniformed state troopers in front row of spectator's section of courtroom to supplement customary security was not inherently prejudicial); *see also Estelle v. Williams,* 425 U.S. 501, 503-04 (1976) (forcing defendant to wear prison clothing before jury served no essential state policy). The test focuses not on "whether jurors actually articulated a consciousness of some prejudicial effect, but rather whether an

unacceptable risk is presented of impermissible factors coming into play." *Holbrook,* 475 U.S. at 570.

In *Carey v. Musladin,* 549 U.S. 70 (2006), a habeas corpus case, the Supreme Court addressed the limits of the "inherent prejudice" test. In *Carey,* a California state court had decided that buttons displaying the victim's image worn by the victim's family members during the petitioner's trial did not deny the petitioner a fair trial. 549 U.S. at 72. In a brief majority opinion, the Supreme Court noted that its previous decisions (*Estelle,* 425 U.S. at 503-06, and *Holbrook,* 475 U.S. at 568) dealt with government-sponsored action, as opposed to the situation in *Carey,* which involved buttons worn by private spectators. *Id.* at 76. The court further noted that though it had articulated a test for inherent prejudice applicable to state conduct, "we have never applied that test to spectators' conduct. Indeed, part of the legal test of *Williams* and *Flynn* – asking whether the practices furthered an essential state interest – suggests that those cases apply only to state-sponsored practices." *Id.* The Court concluded that there had yet been no clear holding regarding inherently prejudicial action by private spectators, and rejected the habeas petition. *Id.* Justices Souter, Stevens, and Kennedy wrote separate concurring opinions, each of them arguing that prior Supreme Court precedent on the subject of prejudice in the courtroom applied generally, including to private spectators. *Id.* at 78-83.

Defendants essentially ask this court to do what the Supreme Court has specifically suggested this court should not do: apply a test previously applied only to

situations involving state conduct to a situation involving private conduct. The primary authorities cited by defendants in support of their argument include two law review articles and the concurring opinions in the *Carey* case. *See* Scott Kitner, *The Need and Means to Restrict Spectators from Wearing Buttons at Criminal Trials,* 27 REV. LITIG. 733, 754-55 (2008); Elizabeth Sierra, *The Newest Spectator Sport: Why Extending Victims' Rights to the Spectators' Gallery Erodes the Presumption of Innocence,* 58 DUKE L.J. 275, 295 (2008); *Carey,* 549 U.S. 70 (Stevens, Kennedy, & Souter, JJ., concurring). Suffice it to say, defendants' position is not well-established in the law. For obvious reasons, the court declines to do what defendants request. It would fly in the face of the Supreme Court's majority decision in *Carey* to apply such a test in this case.

The question is, then, what standard *does* apply? As the Supreme Court has stated, this is an "open question." *Carey,* 549 U.S. at 76; *see also* Pamela H. Bucy, *Courtroom Conduct by Spectators,* 48 U. LOUIS. L. REV. 579, 579 ("To date, there is no recognized method for dealing with [conduct of trial spectators]."). This leaves the court to consider guidance from the Seventh Circuit Court of Appeals. Both sides acknowledge that there is a dearth of authority from the Seventh Circuit on the subject of spectator conduct, but the most relevant case, *Smith v. Farley,* 59 F.3d 659, 664 (7th Cir. 1995), provides adequate guidance.

In *Smith,* the defendant was convicted for murdering a police officer. He later filed a habeas corpus petition, claiming that the audience section of the courtroom was "packed with policemen" during his trial. *Id.* The defendant also claimed that the

prosecutor commented during closing arguments that "we've had a packed courtroom full of police officers" and "our policemen are watching you." *Id.* The Seventh Circuit noted that "[e]fforts by spectators at a trial to intimidate judge, jury, or witnesses violate the most elementary principles of a fair trial." *Id.* However, the court continued, the presence of the police officers in the audience section of the courtroom, even combined with the prosecutors statements, did not create an "atmosphere of intimidation" or include any "intimidating circumstances" sufficient to warrant a conclusion that the defendant was denied a fair trial. *Id.* Ultimately, the court reasoned, "if you kill a policeman and are put on trial for the crime, you must expect the courtroom audience to include policemen." *Id.* The Seventh Circuit surmised that it might be different if the prosecutor had referred to the presence of the police officers in a way that made the jurors uneasy about the consequences of their voting to acquit. *Id.*

The facts in *Smith* were not identical to the present case. It was alleged in *Smith* that police officers were present because they wanted to pressure the jury to vindicate the victim, who was a police officer. By contrast, in this case, defendants claim that firefighters were present because they wanted to pressure a juror who was himself a former fire chief. Also, in *Smith,* the alleged target of intimidation was the jury, in general, whereas in this case, the alleged target was one juror. But these differences do not prevent the court from applying the principles of *Smith* in this case.

What was missing in *Smith,* and what is missing in this case, is some semblance of "intimidating circumstances" or an "atmosphere of intimidation" which would

suggest that the defendants were denied a fair trial. *Smith,* 59 F.3d at 664. The facts of *Smith* were actually more egregious than this case. In *Smith,* the courtroom was "packed" with police officers, and the prosecutor made several references drawing the jury's attention to the police officers' presence. Nevertheless, the court still found that these facts, even in combination, did not create an "atmosphere of intimidation" or include any "intimidating circumstances" suggesting denial of a fair trial. *Id.* In this case, the court assumes there were approximately 20 firefighters in the courtroom, and the Government made no mention of their presence to the jury at any time; the most defendants can point to is the fact that firefighters were mentioned by several witnesses during their testimony, which took place more than a week prior, when the firefighters were not even in the courtroom audience. Even considering the presence of the firefighters in the courtroom during closing arguments together with the references to firefighters by witnesses during other parts of the trial, the facts of this case are insufficient under *Smith* to show denial of a fair trial. The facts simply do not add up to an "atmosphere of intimidation."

To some extent, a defendant who kills the father of a firefighter (whose co-firefighters were also first-responders at the murder scene), must expect that firefighters may come up during witness testimony and that the courtroom audience may contain firefighters. *See Smith,* 59 F.3d at 664. And to the extent that it can be claimed that there was some surreptitious, sinister purpose behind the presence of the firefighters in the courtroom, the mere fact that a juror was exposed to something which could

theoretically affect his vote is not sufficient to require a new trial. *Whitehead v. Cowan,* 263 F.3d 708, 721-22 (7th Cir. 2001). As the Supreme Court has explained, "due process does not require a new trial every time a juror has been placed in a potentially compromising situation. Were that the rule, few trials would be constitutionally acceptable." *Smith v. Phillips,* 455 U.S. 209, 217 (1982).

What due process requires, the Court stated, is "a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." *Id.* In this case, the undersigned watched carefully over the trial to prevent prejudicial occurrences. The references to firefighters during witness testimony were appropriate and relevant to the matters at issue in this case. Further, the firefighters who attended closing arguments, which were open to the public, were quiet, respectful, and non-disruptive. At no point did the undersigned, who heard the testimony in question regarding firefighters and who saw the firefighters in the courtroom during closing arguments, witness anything approaching a miscarriage of justice or any circumstances suggesting that the juror in question would not be capable of or willing to decide the case solely on the evidence before him. Nor does the undersigned see any miscarriage of justice now. Accordingly, defendants' argument regarding witnesses' references to firefighters and the presence of firefighters in the courtroom during closing arguments is rejected.

**IV.    CONCLUSION**

For the foregoing reasons, the court **DENIES** defendants' motions for a new trial.

(DE ## 1171, 1208, 1209.)

**SO ORDERED.**

Date: May 14, 2013

 s/ James T. Moody_____
JUDGE JAMES T. MOODY
UNITED STATES DISTRICT COURT